Tamara Carmichael (TC 0697)
Christelette Hoey (CH 6772)
Joshua Krumholz (*Pro Hac Vice*)
Gillian Rattray (*Pro Hac Vice*)
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY 10007
(212) 513-3200

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

ERIC   FAULKNER,   DUNCAN   FAURE,     07 Civ. 2318 (DAB) (AJP)
ALAN LONGMUIR,   DEREK   LONGMUIR,
LESLIE MCKEOWN and STUART WOOD,

                       Plaintiffs,        **FIRST AMENDED**
                                     **COMPLAINT**

       - against -

ARISTA RECORDS LLC,

                       Defendant.

_____

       The plaintiffs, Eric Faulkner, Duncan Faure, Alan Longmuir, Derek Longmuir, Leslie McKeown and Stuart Wood (collectively the "Bay City Rollers," "Rollers" or "BCR"), by and through their attorneys, Holland & Knight LLP, for their Complaint against the defendant, Arista Records LLC ("Arista"), allege as follows:

<u>**NATURE OF ACTION**</u>

       1.       This action results from Arista's failure to pay royalties over almost thirty years to the Bay City Rollers despite the worldwide sale of millions of singles, albums, compact discs and other recordings, and the breach by Arista and its predecessors of the agreement entered into between BCR and Arista Records, Inc. dated March 4, 1981 (the "1981 Arista Agreement").

2.      This action arises from agreements made in the State of New York.

## THE PARTIES

3.      The plaintiff, Eric Faulkner, is a citizen of the United Kingdom and resides in London, England.

4.      The plaintiff, Duncan Faure, is a citizen of South Africa and resides in Las Vegas, Nevada.

5.      The plaintiff, Alan Longmuir, is a citizen of the United Kingdom and resides in Edinburgh, Scotland.

6.      The plaintiff, Derek Longmuir, is a citizen of the United Kingdom and resides in Edinburgh, Scotland.

7.      The plaintiff, Leslie McKeown, is a citizen of the United Kingdom and resides in London, England.

8.      The plaintiff, Stuart Wood, is a citizen of the United Kingdom and resides in Edinburgh, Scotland.

9.      The defendant, Arista, is a Delaware limited liability company with a principal place in New York, NY.

10.      Upon information and belief, Arista is the successor in interest to Arista Records, Inc. and is liable for the obligations arising under the 1981 Arista Agreement and other agreements described herein.

## JURISDICTION AND VENUE

11.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332. Complete diversity of citizenship exists because this action involves a dispute between a citizen

of the United States and a citizen of a foreign state, and the amount in controversy exceeds US$75,000, exclusive of interest and costs.

12.     This Court has personal jurisdiction over the defendant because Arista's principal place of business is located in New York, NY.

13.     Venue is properly based in this District pursuant to 28 U.S.C. § 1391(a) in that a substantial part of the events and/or omissions giving rise to BCR's claims occurred in this District.

## BACKGROUND

**A.     The Advent of Rollermania**

**The Rollers Achieve Phenomenal Success in the United Kingdom**

14.     Founded in 1967 by bassist Alan Longmuir and his brother and drummer, Derek, in Edinburgh, Scotland, the group that ultimately became known as the Bay City Rollers originally called themselves the Saxons.

15.     Seeking a less English-sounding name, the group later renamed themselves the Bay City Rollers after landing a dart on a map near Bay City, Michigan.

16.     After signing with Bell Records, the Rollers achieved their first hit in 1971, when the single "Keep on Dancing," a cover of the 1965 Gentrys hit, reached No. 9 on the UK hit chart.

17.     Eric Faulkner joined the Rollers in 1972.  Leslie McKeown and Stuart Wood joined the band in 1973, replacing Nobby Clark and John Devine, two of the original members. Duncan Faure joined the band in 1979, replacing Leslie McKeown.

18.     Consistent success for the group came in early 1974, when the Rollers released a string of highly successful singles in the United Kingdom and throughout Europe, all of which reached the UK Top 10 sales charts, including several Top 5 and No. 1 entries.

19.     Their album releases -- "Rollin," "Once Upon A Star," "Wouldn't You Like It" and "Dedication" -- all became Top Ten hits, with "Rollin" and "Once Upon A Star" reaching No. 1 on the UK charts.  "Rollin" stayed on the UK charts for sixty-two weeks.

20.     By the Spring of 1975, the phenomenon known as "Rollermania" had begun.  In that year, the Rollers enjoyed a highly successful UK tour and starred in a week UK television series called "Shang-a-Lang."

21.     That same spring, "Bye, Bye, Baby" stayed at No. 1 for six weeks and, after selling more than a million copies, became the best selling single of the year.  That single was followed by "Give A Little Love," which also hit the top of the charts.

22.     By that time, comparisons of their popularity to the Beatles' earlier popularity were not uncommon.

**Worldwide Success Follows**

23.     The Rollers' success in the UK soon spread to the rest of the world.

24.     In 1975, the Bay City Rollers went on a worldwide tour, including stops in Canada, Australia and Japan.

25.     In Japan, their success has been and remains phenomenal.  The Bay City Rollers are one of only three foreign bands ever to have three No. 1 albums in the country.

26.     In the United States, the Rollers reached No. 1 on the U.S. Billboard Hot 100 with "Saturday Night."  That hit was followed by "Money Honey," which hit the US charts at No. 9, "You Made Me Believe In Magic" and "I Only Want To Be With You."

27.     In total, the Rollers had six singles make the top 40 on the US hits charts.

28.     The Rollers also had five straight gold albums in the US, including "Bay City Rollers," "Rock 'n Roll Love Letter," "It's A Game" and "Greatest Hits."  They also had their own U.S. television show.

**Total Albums and Rights Sold**

29.     Subsequent to their unbroken frontline success as a touring and recording band, which continued until their break-up in 1981, Arista and its licensees have released numerous compilations and greatest hits collections in the United States and abroad.

30.     By Arista's own admission, in 1996, Arista licensed various BCR masters for at least 23 separate compilations.  In 1997, that number increased to thirty-four, and that number was at least twenty-six in the first half of 1998 alone.

31.     The most recent compilation, entitled *Absolute Rollers-The Very Best of*, was released on January 30, 2007.

32.     In total, the Rollers released eight original albums/records from 1974 through 1981, plus numerous compilations and re-releases derived from the catalogue of original recordings.

33.     Third-party reports on total worldwide sales of Bay City Roller LPs have varied. Some reports count sales at 100 million or more albums.  The British Broadcasting Company has asserted that 70 million albums have been sold worldwide.

34.     Arista has benefited from later-developed formats for Bay City Rollers' recordings and, upon information and belief, Arista has received compensation for digital transmissions of these recordings, either via download transmissions, streaming transmissions, or other forms of digital delivery.

- 5 -

35.     Arista has generated millions of dollars from the Rollers through the sale of albums, compact discs, merchandising licenses, master synchronization licenses (such as television, commercial and movie rights), multimedia licenses, digital transmissions, ring tones and other rights and licenses.

36.     As detailed more fully below, however, Arista has never paid the Rollers the royalties to which they are due, nor even provided them with royalty statements to account for the amounts owed.

## B.     The Agreements Between the Parties

### The 1971 Agreement

37.     On or about September 15, 1971, present and former members of BCR entered into an agreement with Bell Records, a division of Columbia Pictures Industries, Inc.   The agreement was entered into with BCR's original line-up as signatories:   Gordon Fraser Clark, Derek Longmuir, Alan Longmuir, Neil Henderson, Archie Marr and Eric Manclark.

38.     In 1974, various Columbia labels, including Bell Records, merged to create a new entity, Arista Records, Inc.   Upon information and belief, Arista Records, Inc. succeeded to the rights and obligations of Bell Records under the 1971 Agreement with BCR.   Upon information and belief, Arista has succeeded to the rights and obligations of Arista Records, Inc.

39.     Pursuant to the terms of the 1971 Agreement, all master recordings made under the agreement and all related derivatives and performances were "entirely and forever the property of Company, free from claims whatsoever by Artist or any person, firm or corporation deriving any rights or interests from Artist."

40.     As consideration for services rendered by BCR and for the rights granted to the company, BCR was to receive, minus costs, various royalty amounts for records sold by the company.

41.     Royalties were to be paid based upon four (4%) percent of ninety (90%) percent of the suggested retail list price for two-sided records sold by the company in the United States and abroad, and fifty (50%) percent of the aforementioned royalties for one-sided records.  These royalty rates were substantially below the prevailing rates at the time.

42.     Accountings of royalties were to be made to BCR twice a year, along with payments of accrued royalties earned by BCR in the preceding half year.

43.     On or about May 21, 1974, Eric Faulkner, Stuart Wood and Leslie McKeown replaced Archie Marr, Neil Henderson and Gordon Fraser Clark as signators of the 1971 Agreement.

**The 1975 Agreement**

44.     In 1975, Stephen Tenenbaum and Lawrence Eichler, U.S. accountants for BCR, organized ALK Enterprises, Inc. ("ALK"), a U.S. corporation.

45.     At the time of its formation, BCR's representatives represented to the members of BCR that ALK and related entities were necessary pass-throughs to lawfully minimize the payment of taxes on income to be received from Arista.  Such information was supported by members of Arista's staff to the band members on various occasions.

46.     The members of the Bay City Rollers were repeatedly assured by their representatives and by Arista representatives that the creation of ALK and other related entities was in their personal interests and was being done to protect those interests.

47.     Based upon those representations, the members of the Bay City Rollers agreed to allow ALK to operate their affairs in the United States.

48.     As a consequence of this arrangement, ALK entered into agreements with Arista, agreed to deliver the product of the recording services of BCR, and had the responsibility to collect and advance royalties from Arista to BCR.  ALK had no other business activities or operations.

49.     On or about July 1, 1975, ALK, on behalf of BCR, entered into a Record Agreement with Arista (the "1975 Agreement").  ALK is identified as the "Producer" in the Agreement.

50.     Pursuant to the 1975 Agreement, Arista engaged ALK "to produce and deliver to [Arista] Masters embodying the performances of the Artist."  The "Artist" is defined as the Bay City Rollers.

51.     The 1975 Agreement also provided that "all records and reproductions made" by BCR, "together with the performances embodied therein, shall . . . be entirely the property of [Arista] in perpetuity . . . ."

52.     Pursuant to the 1975 Agreement, in exchange for these rights and duties, ALK, on BCR's behalf, was to receive royalties for sales made by Arista (and not an Arista licensee) of all BCR recordings of any kind as follows: (1) twelve (12%) percent of ninety (90%) percent of the retail list price for sales of the first two LPs in the United States and United Kingdom; (2) twelve (12%) percent of the retail list price for sales of the third and fourth LPs in the United States and United Kingdom; (3) thirteen (13%) percent of the retail list price for sales of the fifth through eighth LPs in the United States and United Kingdom; and (4) twelve (12%) percent of ninety

(90%) percent of the retail list price for sales of LPs sold by Arista outside of the United States and United Kingdom.

53.     Royalties due ALK on BCR's behalf for sales made by Arista's licensees outside of the United States and United Kingdom were to be calculated as follows:  (1) nine (9%) percent of ninety (90%) percent of the retail list price for sales of the first four LPs outside of those territories; and (2) ten (10%) percent of ninety (90%) of the retail list price for sales of the fifth through eighth LPs outside of those territories.

54.     The 1975 Agreement also provided, *inter alia*, that BCR would receive thirteen (13%) of the retail list price for "Greatest Hits" LPs distributed in the United States and United Kingdom.

55.     In addition, all royalties for records subject to the 1971 Agreement that were sold in the United States or United Kingdom subsequent to July 1, 1975, were to be paid at twelve (12%) percent of ninety (90%) percent of the retail list price.

56.     The above-described royalty rates were substantially below the prevailing market rates at the time, especially for a band of the Rollers' stature.

57.     Under the 1975 Agreement, Arista also was obligated to render an accounting of the royalties payable to ALK on behalf of BCR twice a year, along with payments of accrued royalties earned in the preceding half year.

**The 1981 ALK Agreement**

58.     On March 5, 1981, ALK and the members of the Bay City Rollers, among other parties, entered into a Settlement Agreement (the "1981 ALK Agreement").

59.     Also parties to the 1981 ALK Agreement were personal service corporations of each of the members, Deals Music Management ("Overseas") Limited ("Deals Music") and Bay

City Music Limited ("Bay City"). Each of those corporations has been dissolved with all rights reverting back to the individual members.

60.    Pursuant to the 1981 ALK Agreement, ALK assigned to BCR all of its "right, title and interest in and to" the 1975 Agreement, and "any and all payments or other benefits due at any time after" February 28, 1979.

61.    In addition, ALK assigned to BCR "all right, title and interest" in any claims that ALK had or has against Arista in connection with any of the agreements between them, including the 1975 Agreement.

**The 1981 Arista Agreement**

62.    On or about March 5, 1981, BCR and Arista entered into a separate agreement (the "1981 Arista Agreement").

63.    The 1981 Arista Agreement provided that Arista would "pay royalties to you [BCR] earned from and after February 28, 1979 in respect of master recordings you [BCR] recorded under the Agreement, but only to the extent such payments would otherwise have been payable to ALK . . . ."

64.    Royalties were to be calculated and paid to BCR in the same manner as set forth in the 1975 Agreement.

65.    Pursuant to the 1981 Arista Agreement, all royalties were to be "remitted to "THE BAY CITY ROLLERS" at the following address:   c/o Arrow, Edelstein & Gross, P.C., 1370 Avenue of the Americas, New York, New York 10019 . . . and shall be accompanied by statements with respect to such payments."

66.     The 1981 Arista Agreement also expressly gave BCR "the right to object to our accountings, to make claims and to conduct audits in accordance with the terms of the Agreement."

67.     In exchange for these payments and accountings, BCR agreed to release Arista from obligations and payments owed prior to February 28, 1979, except that BCR retained the right to assert claims based upon certain audits that had been prepared regarding that time period.

68.     As detailed below, Arista never made the payments required under this or any other agreement described herein, nor has it ever accounted for the royalties owed to BCR.

**C.     The Failure to Provide Royalty Statements**

69.     Pursuant to the 1975 Agreement, the 1981 ALK Agreement and the 1981 Arista Agreement, Arista was to render royalty statements twice a year.

70.     Over the years, BCR repeatedly requested that Arista provide such royalty statements.

71.     For instance, in December 1996, counsel for BCR asked counsel for Arista to provide such statements.  Counsel for Arista responded by stating that he believed that prior statements had been "lost."

72.     When BCR's counsel also asked at that time how much money was being held by Arista for the group, Arista's counsel responded only that he was uncertain.

73.     In a letter dated October 22, 2001, BCR's members again asked, through their representative, "to account to us in full for any and/or all worldwide income generated by the group since the 28th February 1979 and payable to the group under the prevailing agreement, dated March 5th 1981."

74.     For reasons never explained by Arista, however, Arista stopped providing royalty statements after entering into the 1981 Agreement.

75.     The first purported royalty statement sent by Arista after the 1981 Arista Agreement was sent in 1993, same twelve years later, and was materially incomplete and wholly inadequate in all material respects.  BCR duly objected to the statement.

76.     Arista purported to send additional royalty statements in 1996 and 1997, both of which were also materially incomplete and wholly inadequate.  BCR duly objected to the statements.

77.     Only in approximately 2004 did Arista begin to provide regular royalty statements.  Those statements were materially incomplete and wholly inadequate.

**D.**     **The Withholding of Royalties and Acknowledgement of Debt**

78.     Notwithstanding the lack of royalty statements, from the beginning of their relationship, Arista and its representatives consistently assured the Bay City Rollers that they would be paid the royalties owed them.

79.     At no time has Arista ever claimed that they did not owe royalties to the Bay City Rollers, and indeed Arista has repeatedly reaffirmed its obligation to pay the band members.

80.     Rather than denying their contractual duty, Arista has taken the position, albeit unjustifiably, that they have been holding all funds owed for over twenty-five years until such time as Arista received clear instructions from the members of BCR as to how the money should be distributed.

81.     As early as April 1980, Arista informed the Rollers' representatives that it was withholding royalties otherwise due BCR.

82.    Arista made the same representation in a letter dated June 23, 1982, claiming the right to ignore a letter of direction regarding payment of the royalties owed.

83.    In a letter dated February 19, 1993, Arista again represented that it was "holding royalty payments due to the Bay City Rollers."

84.    In a letter dated March 25, 1993, Arista again represented that it was "holding" royalties owed "in connection with recordings of the Bay City Rollers."

85.    In a letter dated August 24, 1993, Arista confirmed that no royalties had been paid at least from 1984 through 1992.

86.    In a letter dated August 27, 1999, Strauss Zelnick, the President and CEO of BMG Entertainment, wrote to BCR's representative that the BCR's "claim is being taken seriously by all concerned.  For the avoidance of any doubt in this regard, I will once again pursue this matter with counsel for BMG and Arista and ask that they follow up with you directly."

87.    In a letter dated October 25, 1999, Julie Swidler of Arista wrote to Mark St. John, at that time a representative of all the members of the band, discussing Arista's failure to pay royalties or to account for those royalties.  In that letter, Arista admitted that it had placed a "hold" on all royalty payments at least as far back as 1982.  Arista also reaffirmed in that letter its obligation to pay royalties to BCR under the 1981 Arista Agreement, stating that Arista was "willing to pay the Rollers . . . all accrued royalties with statutory interest," as well as amounts conceded in an audit performed back in the 1970s.

88.    In a letter dated March 3, 2000, Steven M. Hayes, as outside counsel for Arista and BMG Entertainment, stated that "Arista Records has also offered to pay to the band members . . . the amounts which are due and to allow your clients to audit or commence any

action which they deem appropriate in connection with any additional amounts that they believe may be due."

89.     Similarly, in a letter dated November 1, 2001, Glenn Delgado, also of Arista, wrote to Mr. St. John, reiterating the concession that all royalties had been "held" at least since 1982. He also reiterated that Arista was "willing to pay the Rollers all accrued royalties."

90.     In a letter to Mark St. John dated January 9, 2002, Mr. Delgado again reiterated that Arista was "more than willing to pay any accrued royalties to the correct payees."

91.     On April 6, 2004, at 7:44 p.m., Steve Gawley ("Gawley") of Arista sent an e-mail to Clive Rich and Jane Preston ("Preston"), with copies sent to numerous individuals within Arista.

92.     Upon information and belief, Jane Preston contacted Arista to comment upon an anticipated documentary to be aired by the British Broadcasting Company concerning Arista's failure to pay royalties to BCR. Gawley's e-mail was intended to respond to that inquiry.

93.     Among the statements made by Arista in that e-mail were the following:

- "Through our correspondence to Mark St. John, which we have provided to you, *Arista has always maintained and made clear that we would pay any earned royalties to the appropriate parties*."

- "Arista rendered a full and complete accounting, inclusive of international earnings, *when Arista placed the sums owed into escrow*."

94.     Indeed, in that same e-mail, Arista threatened to hold Preston's organization legally culpable if it took a contrary position in its documentary.

95.     Gawley signed the e-mail by ending it with the following salutation:  "Regards, Steve."

96.    In a letter dated January 29, 2002, from Mark St. John ("St. John"), BCR's representative, to Glenn Delgado ("Delgado") of Arista, St. John reconfirmed certain "payee" information previously requested by Arista. Specifically, St. John stated the following:

- "As we have stated in discussion and correspondence, the signatory parties to the '1981 Agreements' are the payees, and have always been so. Their respective corporate entities were formally dissolved some time ago, and their rights (which were always specific to, and on behalf of the group, jointly and severally) are now formally vested in the relevant original members. This has been fully set out and addressed in the past by myself to previous Arista legal executives. Accordingly, for us it is not a matter of who receives the due payments - that has always been clearly defined by the '1981 Agreements'. Any other suggestion would be unsustainable, and I believe that this has always been understood by Arista Records Inc., which entity was a party to the relevant Agreements."

- "The payees are set out in the Agreements. This is clear to all parties."

- "All the signatories to the Agreement are represented here and are in concert as to their position."

97.    Among the payments not made were the royalties generated from March 1979 through March 1981 that became immediately due and payable upon execution of the 1981 Arista Agreement.

98.    Other than one payment of $254,392.56 paid on or about September 2, 1997, Arista has not paid any royalties to the members of the Bay City Rollers in over twenty-five years, notwithstanding the millions owed to them.

99.    Arista's claim over the last twenty-five years that it does not know who to pay is and always has been a pretext intended to deprive the Rollers of the royalties to which they are entitled.

**E.**    **The Failure to Pay the Audited Amounts**

100.    ALK audited Arista's books and records for the period commencing July 1, 1975 through December 31, 1976.

101.    That audit resulted in a claim for $875,245.71 in unpaid royalties due to BCR by Arista.

102.    Other audits disclosed unpaid royalties totaling $243,608.82 and $87,245.71.

103.    None of those amounts have been paid by Arista.

**F.**    **Arista's Breach of Its Fiduciary Obligations**

104.    For over twenty-five years, Arista has held money that it admits it owes to the Bay City Rollers.  At one point, it asserted that it was holding the money in escrow for the band.

105.    Included in those funds were payments received from third-party licensees pursuant to third-party contracts between Arista and those companies.  Those funds represent license payments made to Arista for foreign sales made by independent third-parties.

106.    As the recipient of those third-party funds, Arista has held those funds, and all other funds owed to the Bay City Rollers, in trust for the band.

107.    By wrongfully withholding those funds and the interest that has accumulated over twenty-five years, Arista has breached its fiduciary obligations to the Bay City Rollers.

108.    In addition, Arista has wrongfully maintained that the 1981 Arista Agreement obligated the Rollers to pay certain third parties for fees and costs associated with the recording and sale of the Rollers' recordings.  Prior to that agreement, Arista had paid all third-parties directly.

109.    Those payments were dependent upon the sales generated from the Rollers' recordings.

110.    All information regarding actual sales and amounts owed third parties was and is within the complete control of Arista.

111.    Arista had a fiduciary obligation to provide royalty statements and other third-party information so that the Rollers could know and discharge their contractual obligations to third parties.

112.    By failing to properly account to the Rollers, Arista breached its fiduciary obligations to the Rollers, leaving them potentially liable to third-parties for claims of payment.

113.    In addition, in order to fulfill their contractual obligations to third-parties, the Rollers needed the royalty payments that Arista was obligated to pay them.  Without such payments, the Rollers were and continue to be unable to pay third-parties.

114.    By failing to pay royalties, Arista breached its fiduciary obligations in this manner as well.

115.    By failing to account for and pay royalties provided from third-parties pursuant to third-party licenses, Arista breached fiduciary duty as a trustee of such third-party income, which was paid over to Arista on the basis that further payment to BCR would be properly made, consistent with the duty of care and trust placed upon Arista by the third-party payments.

## COUNT I
### (Breach of Contract)

116.    BCR repeats and realleges each and every allegation contained within paragraphs 1 through 110 inclusive of this Complaint with the same force and effect as if set forth at length herein.

117.    BCR and Arista entered into the 1971 Agreement and the 1981 Arista Agreement.

118.    The 1981 Arista Agreement incorporated certain provisions of the 1975 Agreement.

119.    BCR was assigned certain rights from ALK, including rights in the 1975 Agreement.

120.    BCR has fully performed all of its obligations to Arista under all agreements.

121.    Arista agreed to make certain royalty payments to BCR pursuant to the terms of the 1975 Agreement and the 1981 Arista Agreement.

122.    As recently as April 2004, but also in 2001 and 2002, Arista acknowledged in written, signed documents its obligation to pay those royalties, and admitted that it was "holding" royalties on BCR's behalf.

123.    Despite numerous demands, Arista has failed and refused to pay the royalty amounts required by the 1975 Agreement and the 1981 Arista Agreement for over twenty-five years.

124.    The 1971 Agreement, the 1975 Agreement and the 1981 Arista Agreement also require Arista to furnish BCR with royalty statements specifically accounting for the royalties owed.

125.    Arista has failed to provide BCR with the royalty statements it contractually owes.

126.    Arista has knowingly and intentionally breached the agreements, much to the plaintiffs' great harm.

127.    As a direct and proximate result of Arista's breaches, the Rollers have suffered, and will continue to suffer, substantial damages, including lost royalties and significant personal hardship and suffering.

## COUNT II
### (Breach of Fiduciary Duty)

128.    BCR repeats and realleges each and every allegation contained within paragraphs 1 through 110 inclusive of this Complaint with the same force and effect as if set forth at length herein.

129.    For over twenty-five years, Arista has assured BCR that it would pay the royalties owed it.

130.    Over that time, Arista has assured BCR that the money has been held on their behalf, and indeed at one point asserted that the funds had been separately escrowed.

131.    The long and enduring relationship between Arista and BCR is one of trust and confidence.

132.    Arista acted as fiduciary to BCR, and a fiduciary relationship was created between them.

133.    Arista breached its fiduciary duty by, among other things, failing to pay BCR the royalties due it, and failing to properly account for those royalties.

134.    Arista's actions in breach of its fiduciary duty demonstrate that Arista should not retain ownership or control of the BCR master recordings.

135.    As a direct and proximate result of Arista's breaches, the Rollers have suffered, and will continue to suffer, substantial damages, including lost royalties and significant personal hardship and suffering.

## COUNT III
### (Constructive Trust)

136.    BCR repeats and realleges each and every allegation contained within paragraphs 1 through 110 inclusive of this Complaint with the same force and effect as if set forth at length herein.

137.    The long and enduring relationship between Arista and BCR is one of trust and confidence.

138.    Arista acted as fiduciary to BCR, and a fiduciary relationship was created between them.

139.    Arista breached its fiduciary duty to BCR by failing to pay BCR royalties due and failing to properly account for the royalties that were owed.

140.    Arista expressly represented on many occasions and over many years that it was holding accrued royalties for BCR and would pay royalties due to BCR, as required under the 1971 Agreement, the 1975 Agreement and the 1981 Arista Agreement.

141.    In reliance on those representations, BCR continued to adhere to their contractual obligations and continued to record albums and generate royalties and revenue for Arista.

142.    BCR has not received the royalty amounts due them for over twenty-five years.

143.    By collecting royalties on BCR works and failing to pay BCR royalties due them, Arista has been unjustly enriched.  Arista has received a benefit, the retention of which would be unjust.

144.    A constructive trust should be imposed in favor of BCR to prevent unjust enrichment by Arista and to prevent further inequities stemming from Arista's retention of BCR's royalties for over twenty-five years.

145.    As a direct and proximate result of Arista's breaches, the Rollers have suffered, and will continue to suffer, substantial damages.

**COUNT IV**
**(Accounting)**

146.    BCR repeats and realleges each and every allegation contained within paragraphs 1 through 110 inclusive of this Complaint with the same force and effect as if set forth at length herein.

147.    Arista had a contractual duty to account for the royalties due and owing BCR.

148.    Arista also had a fiduciary duty to account for the royalties due and owing BCR.

149.    Arista breached its contractual and fiduciary duties to BCR by failing to properly account for those royalties.

150.    Because Arista has not properly accounted for royalties due to BCR, BCR does not know what monies Arista received under the agreement, or the proper amount of royalties due.

151.    An accounting of Arista's financial affairs as they pertain to the 1971 Agreement, the 1975 Agreement and the 1981 Arista Agreement should be granted so that BCR may determine the amount of monies due.

152.    As a direct and proximate result of Arista's breaches, the Rollers have suffered, and will continue to suffer, substantial damages.

WHEREFORE, the plaintiffs, Eric Faulkner, Duncan Faure, Alan Longmuir, Derek Longmuir, Leslie McKeown and Stuart Wood, demand judgment and relief against the defendant, Arista Records LLC, as follows:

1.     Entering judgment in their favor and against the defendant on Counts I through IV of the Complaint;

2.     Awarding the Bay City Rollers compensatory damages, punitive damages, interest, costs and attorneys' fees;

3.     Imposing a constructive trust on the monies owed to the Bay City Rollers and being held by Arista;

4.     Order that Arista provide a statement accounting for all royalties owed the Bay City Rollers;

5.     Award the Bay City Rollers all right, title and interest in all master recordings, and in all copyrights in works created by the Bay City Rollers and held by Arista or any related entity; and

6.     Granting such other, further and different relief as this Court deems just and proper.

## JURY DEMAND

The plaintiffs demand a trial by jury on all issues so triable.

Dated:  New York, New York

     July 13, 2007

                HOLLAND & KNIGHT LLP

                By: _____

                  Tamara Carmichael (TC 0697)
                  Christelette Hoey (CH 6772)
                  Joshua Krumholz (*Pro Hac Vice*)
                  Gillian Rattray (*Pro Hac Vice*)
                  195 Broadway
                  New York, New York 10007
                  (212) 513-3200

                  Attorneys for Plaintiffs Eric Faulkner,
                  Duncan Faure, Alan Longmuir, Derek Longmuir,
                  Leslie McKeown and Stuart Wood

## CERTIFICATE OF SERVICE

I hereby certify, pursuant to Title 28 U.S.C.§1746, that on July 13, 2007, I served a copy of the attached First Amended Complaint, by mailing it in a sealed envelope, with postage prepaid thereon, in an official depository of the U.S. Postal Service, to be delivered by First Class Mail to:

Robert A. Jacobs
Manatt, Phelps & Phillips, LLP
7 Times Square
New York, NY 10036

Heimer Loa Firm
67 Wall Street, Suite 2211, Pmb-8370
New York, New York 10005

I declare under penalty of perjury that the foregoing is true  and correct. Executed on July 13, 2007.

Elvin Ramos
Holland & Knight LLP
195 Broadway
New York, NY 10007