UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
ERIC FAULKNER, DUNCAN FAURE,
ALAN LONGMUIR, DEREK LONGMUIR,
LESLIE MCKEOWN, AND STUART WOOD,

                    Plaintiffs,

        -against-

                                    07 Civ. 2318 (DAB)
                                    MEMORANDUM & ORDER

ARISTA RECORDS LLC,

                    Defendant.
----------------------------------------X
DEBORAH A. BATTS, United States District Judge.

        Plaintiffs Eric Faulkner, Duncan Faure, Alan Longmuir, Derek

Longmuir, Leslie McKeown, and Stuart Wood, former members of the

1970s hit rock group, the Bay City Rollers (the "Rollers"), bring

claims for breach of contract, breach of fiduciary duty,

constructive trust, and accounting against Defendant Arista

Records LLC ("Arista"), their record label.  Plaintiffs allege

that Defendant breached its 1981 contract with Plaintiffs by

refusing to account for the royalties Plaintiffs were due under

that agreement, and by withholding payment of those royalties to

Plaintiffs for over twenty-five years.  Plaintiffs further allege

that Parties' long relationship was fiduciary in nature, and that

Arista breached its fiduciary duty to Plaintiffs by, among other

things, failing to pay or properly account for these royalties.

Plaintiffs seek the imposition of a constructive trust in favor

of Plaintiffs to prevent Arista's unjust enrichment, and an accounting that will enable Plaintiffs to determine the total amount of money they are owed.  Plaintiffs further seek compensatory and punitive damages, interest, costs and attorneys' fees as well as all right, title and interest in all their master recordings, and in all copyrights in works created by the Rollers and held by Arista or any related entity.

Defendant Arista moves to dismiss Plaintiffs' claims pursuant to Fed R. Civ. P. Rule 12(b)(6).  Defendant does not deny that it has failed to pay Plaintiffs the royalties they are due under the Parties' 1981 contract.  Defendant argues instead that Plaintiffs' breach of contract claim – filed decades after Defendant's initial failure to pay or account for the royalties due – is time-barred.  Defendant argues that Plaintiffs' remaining claims fail as a matter of law because there was no fiduciary relationship between the Parties, as required by each of those claims, because the claims are duplicative of Plaintiffs' breach of contract claim, and because the claims are likewise time-barred.

For the reasons set forth below, Defendant's Motion to Dismiss Plaintiffs' First Amended Complaint is GRANTED in part and DENIED in part.

2

### I. FACTUAL BACKGROUND

The following facts alleged in the First Amended Complaint
in 07 Civ. 2318, filed on July 13, 2007, are assumed to be true
for purposes of this Memorandum and Order.

Plaintiffs Eric Faulkner, Duncan Faure, Alan Longmuir, Derek
Longmuir, Leslie McKeown and Stuart Wood were members of the
1970's musical group known as the "Bay City Rollers." (Am. Compl.
¶¶ 14 & 17-18)  Originating in the United Kingdom and achieving a
number of Top Ten hits on the UK charts, the group's success
"spread to the rest of the world" by the mid-70s.  (Id. ¶¶ 23-28)
Between 1974 and their break-up in 1981, the Rollers released
eight original albums, as well as numerous compilations and re-
releases derived from their catalogue of original recordings.
(Id. ¶ 32)  After the band's break-up, compilations and greatest
hits collections continued to be released in the United States
and abroad.  (Id. ¶ 29)  Third-party estimates of the group's
total worldwide album sales range between 70 million to over 100
million.  (Id. ¶ 33)

On or about September 15, 1971, present and former members
of the Rollers entered into an agreement (the "1971 Agreement")
with Bell Records, a division of Columbia Pictures Industries,

3

Inc.[1]  (Id. ¶ 37)  Three years later, in 1974, Bell Records and
other Columbia labels merged to create a new entity, Arista
Records, Inc., which succeeded to the rights and obligations of
Bell Records under the 1971 Agreement with the Rollers.  (Id. ¶
38)  Defendant Arista Records LLC ("Arista") later succeeded to
the rights and obligations of Arista Records, Inc.  (Id.)
Pursuant to the terms of the 1971 Agreement, all master
recordings made under the agreement and all related derivatives
and performances became "entirely and forever the property of"
the recording company (Bell Records in 1971, succeeded by
Defendant Arista), in exchange for which the Rollers received
various royalty amounts for records sold.  (Id. ¶¶ 39-41)

    Beginning in 1975, a corporation known as ALK Enterprises
("ALK") began to operate the affairs of the Rollers in the United
States, (id. ¶¶ 44 & 47) and on or about July 1, 1975, ALK
entered into a new agreement with Arista (the "1975 Agreement")
on behalf of the Rollers.  (Id. ¶ 49)  Pursuant to the 1975
Agreement, ALK as the Rollers' "Producer" was to receive various
royalties on the Rollers' behalf in exchange for "all records and

---

[1] The signatories of the 1971 Agreement were the Rollers'
original members: Gordon Fraser Clark, Derek Longmuir, Alan
Longmuir, Neil Henderson, Archie Marr, and Eric Manclark.  (Am.
Compl. ¶ 37)  On or about May 21, 1974, Eric Faulkner, Stuart
Wood and Leslie McKeown replaced Archie Marr, Neil Henderson, and
Gordon Fraser Clark as signatories of that Agreement.

reproductions made" by the Rollers "together with the performances embodied therein." (<u>Id.</u> ¶¶ 49-55)

On March 5, 1981, upon the group's break-up, Plaintiffs entered into two settlement agreements – the first with ALK (the "1981 ALK Agreement"), and the second with Arista (the "1981 Arista Agreement"). Pursuant to the 1981 ALK Agreement, under which the Rollers regained their royalty rights from ALK, ALK assigned to Plaintiffs all of its "right, title and interest in and to" the 1975 Agreement, and "any and all payments or other benefits due at any time after" February 28, 1979. (<u>Id.</u> ¶ 60) In addition, ALK assigned to Plaintiffs "all right, title and interest" in any claims that ALK had against Arista in connection with any of the agreements between them, including the 1975 Agreement. (<u>Id.</u> ¶ 61)

The 1981 Arista Agreement, the contract at issue in this action, provided in pertinent part that:

> ". . . [Arista] shall pay royalties to [the Bay City Rollers] earned from and after February 28, 1979 in respect of master recordings [the Rollers] recorded under the Agreement, but only to the extent such payments would otherwise have been payable to ALK. . . . All such monies shall be remitted to 'THE BAY CITY ROLLERS' at the following address: c/o Arrow, Edelstein & Gross, P.C., 1370 Avenue of the Americas, New York, New York 10019, Attention: Gerald F. Edelstein, Esq. and shall be accompanied by statements with respect to such payments."

(1981 Arista Agreement, at Jacobs Decl., May 18, 2007, Ex. 8 at
2)  Under the Agreement, Arista was to render royalty statements
to Plaintiffs twice a year.  (Am. Compl. ¶ 69)  In exchange for
the designated royalty payments and statements, Plaintiffs
released Arista from payments and other obligations due to the
Rollers prior to February 28, 1979, except that Plaintiffs
retained the right to assert claims based upon audits that had
been prepared pertaining to that time period.  (Id. ¶ 67)

The 1981 Arista Agreement further provided that: "This
agreement is the entire agreement between the parties and shall
not be modified, except by an instrument in writing, signed by
each of the parties duly authorized to execute such
modification."  (1981 Arista Agreement, at Jacobs Decl., May 18,
2007, Ex. 8 at 6)

Despite the terms of the 1981 Arista Agreement, and repeated
requests made by Plaintiffs to Defendant over the years, "for
reasons never explained," Arista "stopped providing royalty
statements after entering into the 1981 Agreement."  (Am. Compl.
¶¶ 70-74)  According to Plaintiffs, Arista sent its "first
purported royalty statement" in 1993, additional statements in
1996 and 1997, and began to provide regular royalty statements
only in 2004; however, Plaintiffs "duly objected to" all of these
statements as "materially incomplete and wholly inadequate."

6

(Id. ¶¶ 75-77)  Plaintiffs further allege that "[o]ther than one payment of $254,392.56 paid on or about September 2, 1997, Arista has not paid any royalties" to Plaintiffs in over 25 years.  (Id. ¶ 98)

Plaintiffs allege that included in the funds that Arista has withheld from Plaintiffs are payments Arista has received from third-party licensees of the Rollers' music.  (Id. at ¶ 105) Plaintiffs also allege that Arista has wrongfully claimed that the 1981 Agreement between Parties obligated Plaintiffs to pay third parties for fees and costs associated with the recording and sale of their recordings.  (Id. ¶ 108)  While such payments were dependent upon sales generated from Plaintiffs' recordings, all information about actual sales and amounts owed by Plaintiffs to third parties allegedly was and is within the complete control of Defendant, preventing Plaintiffs from knowing and fulfilling any contractual obligations they may have, and leaving Plaintiffs potentially liable to third parties for claims of payment.  (Id. ¶¶ 109-112)

At no time has Defendant ever claimed that it did not owe royalties to Plaintiffs under the 1981 Arista Agreement, but rather, has in the years since making the Agreement repeatedly reaffirmed in writing its obligation to pay Plaintiffs under that Agreement.  (Id. ¶ 78)  Defendant explains its failure to pay the

7

royalties due by alleging that it did not know to whom and where to direct the payments.  (Id. ¶¶ 80 & 99; see also Letter from Glenn Delgado to Mark St. John, Nov. 1, 2001, at Jacobs Decl., Ex. 1; Letter from Glenn Delgado to Mark St. John, Jan. 9, 2002, at Jacobs Decl., Ex. 2)  Defendant does not dispute that the 1981 Arista Agreement clearly set forth payee information.  (See 1981 Arista Agreement, at Jacobs Decl., May 18, 2007, Ex. 8 at 2) Defendant claims instead that about a year after the Agreement was made, the payee designated in the Agreement - Arrow, Edelstein & Gross, P.C. - changed its name and address, and the same year, three members of the band sent Defendant a letter directing Defendant to send royalty payments and statements to a third party.  (See Letter from Glenn Delgado to Mark St. John, Nov. 1, 2001, at Jacobs Decl., July 11, 2007, Ex. 1 at 1) According to Defendant,

> "As: (i) there was a dispute among the members of the Rollers regarding where statements and payments should be rendered[;]  (ii) the address on file for rendering statements and payments was incorrect; (iii) the 1981 Agreement provides that the 'agreement shall not be modified, except by an instrument in writing, signed by each of the parties duly authorized to execute such modification'; and (iv) Arista did not receive a change of address/payee letter, signed by all of the parties, in accordance with the terms of the 1981 Agreement, Arista placed royalties on hold to avoid a payment to an incorrect party."

(Id. at 1-2)  Through a number of letters, the commencement of an
interpleader action against the original signatories to the 1981
Arista Agreement, and the negotiation of a mutually-agreed upon
settlement agreement which Defendant claims was never executed by
Plaintiffs, Defendant insists that it "has always attempted, in
good faith, to resolve the issues" surrounding outstanding
royalties owed by Arista to the Rollers, and has been "willing to
pay the Rollers all accrued royalties . . . provided Arista
receives a correct change of address/payee letter signed by all
of the parties" according the terms of the 1981 Agreement.  (Id.
at 2-3)

    In addition to a number of letters exchanged between Parties
prior to 2001, (Am. Compl. ¶¶ 81-88) representatives of Arista
produced three written communications (two letters dated November
1, 2001 and January 2, 2002, and an email dated April 6, 2004)
within six years of the March 20, 2007 filing of this action that
reiterated their debt to Plaintiffs.  First, on November 1, 2001,
Arista's Director of Business and Legal Affairs, Glenn Delgado,
wrote to Mark St. John, the Rollers' representative, summarizing
the payee dispute to date.  He concluded, in pertinent part,
that:

    ". . . Arista remains committed to resolving all of the
    outstanding issues with the Rollers, in a fair and
    amicable way.  To that end, Arista would be willing to

pay the Rollers all accrued royalties and the amount
Arista conceded to in connection with the audit, provided
Arista receives a correct change of address/payee letter
signed by all of the parties in accordance with the terms
of [the] 1981 Agreement. . . .   Please understand that
this letter is intended to facilitate settlement
discussions and is not intended to be a full statement of
all the facts and circumstances concerning this matter or
a waiver of any of Arista's rights or remedies, all of
which are hereby expressly reserved."

(Letter from Glenn Delgado to Mark St. John, Nov. 1, 2001, at

Jacobs Decl., July 11, 2007, Ex. 1 at 2-3)

On January 9, 2002, Mr. Delgado again wrote to Mr. St. John

on behalf of Arista, essentially restating the position that

Defendant had set forth in its previous letter of November 1,

2001, including, in pertinent part, that "Arista would be more

than willing to pay any accrued royalties to the correct payees,

provided we receive correct payee information . . ." (Letter from

Glenn Delgado to Mark St. John, Jan. 9, 2002, at Jacobs Decl.,

July 11, 2007, Ex. 2)

Plaintiffs allege that on April 6, 2004, Arista for the

third time confirmed in writing its intention to pay earned

royalties to Plaintiffs when Steve Gawley of Arista sent an email

(the "Gawley email") to Clive Rich and Jane Preston – but not to

Plaintiffs or to Plaintiffs' representatives – regarding a

documentary to be aired by the British Broadcasting Company about

Arista's failure to pay royalties to the Rollers.  (Am. Compl. ¶¶

91-92)  Plaintiffs assert that Jane Preston had contacted Arista

for comment upon the anticipated documentary, and that the Gawley email was intended to respond to that inquiry.  (Id. at ¶ 92) Among other things, Plaintiffs allege that Mr. Gawley stated in that email that,

> "Through our correspondence to Mark St. John, which we have provided to you, Arista has always maintained and made clear that we would pay any earned royalties to the appropriate parties. . . . Arista rendered a full and complete accounting, inclusive of international earnings, when Arista placed the sums owed into escrow."

(Id. ¶ 93)  Plaintiffs further allege that Arista threatened to hold Preston's organization legally culpable if it took a contrary position in its documentary to the one asserted by Defendant in the Gawley email.  (Id. ¶ 94)

While Defendant has many times insisted that the requested payee information was never supplied, and as such, Defendant could not make any royalty payments to Plaintiffs, Plaintiffs assert their "belie[f] that Arista has had the requested payee information for a significant period of time."  (Letter from Joshua C. Krumholz to Robert A. Jacobs, Krumholz Decl., Ex. 2) Nevertheless, in an effort "to avoid any doubt," Plaintiffs provided Defendant with a "notice of 'change of address/payee letter' as requested," signed by all named Plaintiffs to this action, in a correspondence dated August 16, 2007.  (Krumholz Decl., Exs. 2-3)

Plaintiffs filed this action on March 20, 2007.  Defendant first moved to dismiss Plaintiffs' complaint on May 21, 2007. Plaintiffs subsequently filed their First Amended Complaint with the Court on July 13, 2007.  Defendant filed the instant Motion to Dismiss Plaintiffs' First Amended Complaint on August 6, 2007; Plaintiff responded on August 20, 2007.  The Motion was fully briefed as of September 17, 2007.

## II. DISCUSSION

### A.    Legal Standard

For a complaint to survive dismissal under Rule 12(b)(6), the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 127 S.Ct. 1955, 1974 (2007).  In other words, a plaintiff must satisfy "a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible."  Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Twombly, 127 S.Ct. at 1964-65 (internal quotation marks omitted).  In deciding a motion to dismiss, the court "must accept as true all of the factual allegations set out in

12

plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." <u>Roth v. Jennings</u>, 489 F.3d 499, 510 (2d Cir. 2007) (citation omitted). However, "general, conclusory allegations need not be credited . . . when they are belied by more specific allegations of the complaint." <u>Mortimer Off Shore Servs., Ltd. v. Fed. Republic of Germany</u>, No. 05 Civ. 10669, 2007 WL 2822214, at *7 (S.D.N.Y. Sept. 27, 2007).

In ruling on a 12(b)(6) motion, a court may consider the complaint as well as "any written instrument attached to the complaint as an exhibit or any statements or documents incorporated in it by reference." <u>Zdenek Marek v. Old Navy (Apparel) Inc.</u>, 348 F.Supp.2d 275, 279 (S.D.N.Y. 2004) (citing <u>Yak v. Bank Brussels Lambert</u>, 252 F.3d 127, 130 (2d Cir. 2001) (internal quotations omitted)). It is also "well established that a district court may rely on matters of public record in deciding a motion to dismiss under Rule 12(b)(6), including case law and statutes." <u>Pani v. Empire Blue Cross Blue Shield</u>, 152 F.3d 67, 75 (2d Cir. 1988); <u>see also</u> <u>Dayton Monetary Associates v. Donaldson, Lufkin, & Jenrette Securities</u>, 1992 WL 204374, at *3 (S.D.N.Y. 2002) (public court filings considered on 12(b)(6) motion to dismiss).

13

B.    Breach of Contract

Plaintiffs allege that Defendant Arista has breached its contractual obligations to Plaintiffs to account for and make royalty payments due to Plaintiffs pursuant to the terms of the 1981 Arista Agreement and provisions of the 1975 Agreement incorporated therein.[2]  Defendant does not contest that it has not fully accounted for or made the royalty payments required by its contract with Plaintiffs.  Defendant instead moves to dismiss Plaintiffs' breach of contract claim as time-barred by the relevant statute of limitations.

There is no dispute between Parties that Plaintiffs' breach of contract claim is governed by New York law, as stated in the 1981 Agreement.  (1981 Agreement, at Jacobs Decl., May 18, 2007, Ex. 8 at 6)  In New York, the statute of limitations on a claim for breach of contract is six years.  N.Y. C.P.L.R. § 203(a); Guilbert v. Gardner, 480 F.3d 140, 149 (2d Cir. 2007).  A cause of action for breach of contract ordinarily accrues and the limitations period begins to run upon breach.  Guilbert, 480 F.3d at 149.  If a contract requires continuing performance over a period of time, each successive breach may begin the statute of limitations running anew.  Id. at 150.

---

[2] Hereinafter, this Memorandum and Order will refer to the 1981 Arista Agreement and incorporated provisions of the 1975 Agreement simply as "the 1981 Agreement."

Because Plaintiffs allege that Defendant never paid them "two years of royalties that became due immediately upon execution of the Arista Agreement," (Pls.' Opp. at 6) triggering a breach when the contract was executed in March 1981, Plaintiffs' breach of contract claim with respect to the 1981 Agreement with Arista ordinarily would have become time-barred under New York law in March 1987.  However, Defendant's obligation to account for and pay Plaintiffs their royalties had no set end date; it was a continuing obligation according to the 1981 Agreement, "from and after February 28, 1979."  (1981 Arista Agreement, at Jacobs Decl., May 18, 2007, Ex. 8 at 2)  As such, Plaintiffs' claim that Defendant has breached its contractual obligations within six years of the commencement of this action is timely.

Under the continuing obligation theory alone, Plaintiffs' breach of contract claim would be limited to the six-year period before the lawsuit was filed.  See, e.g., Beller v. William Penn Life Ins. Co., 8 A.D.3d 310, 314 (2d Dept. 2004).  However, under N.Y. General Obligations Law § 17-101, a written acknowledgement of a contractual obligation made subsequent to the execution of the contract may effectively toll the statute of limitations for a breach of contract claim.  Section 17-101 provides that:

> "An acknowledgement or promise contained in a writing signed by the party to be charged thereby is the only competent evidence of a new or continuing contract

15

> whereby to take an action out of the operation of the
> provisions of limitations of time for commencing actions
> under the civil practice law and rules. . ."

N.Y. Gen. Oblig. Law § 17-101.  To toll effectively or restart

the running of the statute of limitations under § 17-101, an

acknowledgment or promise must be in writing, be signed by the

debtor party, "recognize an existing debt and contain nothing

inconsistent with an intention on the part of the debtor to pay

it."  GP Hemisphere Associates, LLC, v. The Republic of

Nicaragua, 2000 WL 1457025, at *3 (S.D.N.Y. Sept. 28, 2000)

(internal quotations omitted); Lew Morris Demolition v. Board of

Education, 40 N.Y.2d 516, 521, 387 N.Y.S.2d 409, 355 N.E.2d 369

(1976).  An effective acknowledgment may take a variety of forms.

Id.  "In determining the effectiveness of an acknowledgment, the

critical determination is whether the acknowledgment imports an

intention to pay."  In re Brill, 318 B.R. 49, 54 (Bankr.S.D.N.Y.

2004) (internal quotations and citation omitted); see also Banco

Do Brasil S.A. v. State of Antigua and Barbuda, 268 A.D.2d 75,

707 N.Y.S.2d 151 (1st Dep't 2000) ("an intention to pay . . . is

all that need be shown in order to satisfy section 17-101").  A

written acknowledgment need not specify the precise amount owed

to effectively toll the statute of limitations.  United Rubber,

Cork, Linoleum & Plastic Workers of Am., AFL-CIO v. Great Am.

Indus., Inc., 479 F.Supp. 216, 230 (S.D.N.Y. 1979).  An

acknowledgment of an existing debt and the intent to pay the same

16

must, however, be unconditional.  In re Brill, 318 B.R. at 54.
If any condition must be satisfied prior to payment being made,
the creditor must show that the condition has been satisfied
before application of the toll embodied in § 17-101.  Id.

Plaintiffs claim that Defendant has on at least three
occasions over the past six years rendered an express, written
acknowledgment and intention to pay its debt to Plaintiffs.
First, on November 1, 2001, Arista's Director of Business and
Legal Affairs, Glenn Delgado, wrote to Mark St. John, the
Rollers' representative, that:

> "Arista remains committed to resolving all of the
> outstanding issues with the Rollers in a fair and amicable
> way.  To that end, Arista would be willing to pay the
> Rollers all accrued royalties and the amount Arista conceded
> to in connection with the audit, provided Arista receives a
> correct change of address/payee letter signed by all of the
> Parties in accordance with the terms of [the] 1981
> Agreement."

(Letter from Glenn Delgado to Mark St. John, Nov. 1, 2001, at
Jacobs Decl., July 11, 2007, Ex. 1 at 2-3).  Second, on January
9, 2002, Mr. Delgado again wrote to Mr. St. John, reiterating
that "Arista would be more than willing to pay any accrued
royalties to the correct payees, provided we receive correct
payee information . . ." (Letter from Glenn Delgado to Mark St.
John, Jan. 9, 2002, at Jacobs Decl., July 11, 2007, Ex. 2).
Third, on April 6, 2004, Steve Gawley of Arista sent an email
("Gawley email") to Clive Rich and Jane Preston in response to

17

inquiries regarding a documentary to be aired about Arista's failure to pay the Rollers their royalties.  (Am. Compl. ¶¶ 91-92)  Plaintiffs allege that Mr. Gawley stated in that email that:

> "Through our correspondence to Mark St. John, which we have provided to you, Arista has always maintained and made clear that we would pay any earned royalties to the appropriate parties."

(Id. ¶ 93)

Defendant disputes that either letter sent by Glenn Delgado to Mark St. John constitutes a written acknowledgment sufficient to toll the statute of limitations under N.Y. General Obligations Law § 17-101.  Defendant argues that the letters were "conditional settlement offer[s]" to pay to Plaintiffs an "unspecified amount" of accrued royalties and, as such, do not make out the clear and unconditional intention to pay a specific debt that is required by the statute.  (Def.'s Reply Memo, July 11, 2007, at 8)  Defendant argues that the Gawley email does nothing more than refer to those prior conditional settlement offers, does not acknowledge that Arista actually has any earned royalties to pay, and was neither directed to Plaintiffs, nor intended to influence them.  (Def.'s Memo of Law, August 6, 2007, at 4-5)  Defendant further contends that Plaintiffs are unable to demonstrate that they satisfied the condition precedent to any

18

intention to pay that Defendant may have expressed -
specifically, providing the necessary and requested payee
information.  (Def.'s Reply Memo, July 11, 2007, at 8)

     Defendant's assertions are unpersuasive, particularly at
this stage of the litigation.  Each Delgado letter is quite
clearly in writing and signed by Defendant's Director of Business
and Legal Affairs, Mr. Delgado.  Each of the letters plainly
recognizes Arista's debt to Plaintiffs, specifically referencing
the 1981 Agreement between the Parties and conceding the
continuing validity of the contractual obligation.  (<u>See</u> Jacobs
Decl., July 11, 2007, Ex. 1 at 3 & Ex. 2 at 1)  On their face,
the statements made by Defendant in the letters - that "Arista
remains committed to resolving all of the outstanding issues with
the Rollers . . . .  To that end, Arista would be willing to pay
the Rollers all accrued royalties and the amount Arista conceded
to in connection with the audit. . ." and "Arista would be more
than willing to pay any accrued royalties to the correct payees"
- twice import a clear intention to pay Plaintiffs.  (<u>Id.</u>)
Certainly, the letters "contain nothing inconsistent with an
intention" on the part of Arista to pay the debt owed.  <u>GP</u>
<u>Hemisphere Associates, LLC</u>, 2000 WL 1457025, at *3.

     Defendant insists that the Delgado letters are inconsistent
with Defendant's contractual obligation because the letters
include that Defendant reserves its rights.  (<u>Id.</u> at 3)
19

Defendant's notice that it reserves its rights, however, does
nothing to disturb its written acknowledgment that it is willing
to pay "all accrued royalties" to Plaintiffs in accordance with
the 1981 Agreement.  Defendant's reliance on Lew Morris
Demolition Co., Inc. v. Board of Education of the City of New
York, 40 N.Y.2d 516, 387 N.Y.S.2d 409 (1976) on this point is
unconvincing.  In that case, the defendant expressly repudiated
its obligations under a contract in the course of making its
settlement offer.  The defendant had specifically advised the
plaintiff that the settlement it was offering was in no way to be
understood as a "final payment or payment of any character under
said contract. . ." Id. at 519.  The Delgado letters contain no
such language.  Neither letter offers to settle the dispute
between Parties for any sum other than that which is properly due
under the Parties' contract.  Rather, a plain reading of the
Delgado letters demonstrates a forthright acknowledgment of
Defendant's contractual obligations.

     Defendant's strongest argument for dismissal of Plaintiffs'
breach of contract claim is that the written acknowledgments made
by Defendant were not unconditional; they conditioned Defendant's
intention to pay upon the receipt of correct payee information
from Plaintiff.  Indeed, the letters specifically condition
Defendant's willingness to pay with the clauses, "provided Arista
receives a correct address/payee letter signed by all of the

20

parties," and "provided we receive correct payee information ..."
(Jacobs Decl., July 11, 2007, Ex. 1 at 3 and Ex. 2 at 1)
Defendant maintains that it never received the required payee
information, and as such, Plaintiffs failed to satisfy the
condition precedent set by Defendant's written acknowledgments.
Plaintiffs do not contest that a condition precedent, if
contained in an acknowledgment, must be fulfilled in order to
satisfy the requirements of § 17-101, or that it is Plaintiffs'
burden, as creditor, to show that they have satisfied the
condition set by Defendant. (Pls.' Opp., August 2, 2007, at 13)
Indeed, the relevant case law is well-settled on these points.
See, e.g., In re Brill, 318 B.R. at 54.

Plaintiffs submit instead that they "long ago gave Arista
the necessary payee information," (Pls.' Opp., August 2, 2007, at
13) referencing a letter from Plaintiffs' representative, Mark
St. John (the "St. John letter") dated January 29, 2002. This
letter refers to prior "discussion and correspondence" between
the Parties that allegedly established the proper payee
information. (Am. Compl. ¶ 96; Jacobs Decl., August 7, 2001, Ex.
1 at 1)   The St. John letter further states that the proper payee
information "has been fully set out and addressed in the past . .
. to previous Arista legal executives." (Jacobs Decl., August 7,
2001, Ex. 1 at 1)   The Court notes that Defendant's uncontested
remission of royalty statements to Plaintiffs in 1993, 1996,

21

1997, and regularly beginning in 2004, (Am. Compl. ¶¶ 75-77)
suggests that Defendant at one point possessed payee information
that it found satisfactory enough to send Plaintiffs statements
of the royalty amounts they were owed.

   To "avoid any doubt" as to whether Plaintiffs had provided
Arista with the requested payee information, Plaintiffs forwarded
a "notice of 'change of address/payee letter' as requested" to
Arista on August 16, 2007, signed by the six original signatories
of the 1981 Agreement, the Plaintiffs in this action.   (Krumholz
Decl., Tabs 2 & 3)   The Court notes that that letter was
submitted to Defendant by Plaintiffs within six years of the
earliest alleged written acknowledgment of Defendant's existing
debt to Plaintiffs and its intention to pay - the November 1,
2001 Delgado letter.

   At this stage in the proceedings, drawing all reasonable
inferences in Plaintiffs' favor, there is at least a question of
fact as to whether the condition set forth in the Delgado letters
was satisfied by Plaintiffs, and thus, whether the writings from
Defendant to Plaintiffs constitute written acknowledgments of
Defendant's debt sufficient to toll the statute of limitations
for Plaintiffs' breach of contract claim under N.Y. Gen. Oblig.
Law § 17-101.   Unlike the cases upon which Defendant relies, see
Randustrial v. Acme Distribution Center, 79 A.D.2d 862, 434
N.Y.S.2d 511, 512 (N.Y.A.D. 1980) (plaintiff failed even to

allege that it had performed the condition precedent); In re
Brill, 318 B.R. at 55-56 (creditor "[did] not allege or prove
that [d]ebtor became able to pay at any time," when the condition
precedent was debtor's ability to pay), Plaintiffs here have made
a prima facie showing that the condition precedent has been
satisfied.  Whether the statute of limitations has been tolled,
and thus, whether Plaintiffs' breach of contract claim remains
ripe, will rely ultimately on this fact-intensive inquiry, see
Clarkson Co. Ltd. v. Shaheen, 533 F. Supp. 905, 932 (S.D.N.Y.
1982), which is inappropriate for resolution at this juncture.
Defendant's motion to dismiss Plaintiffs' breach of contract
claim on statute of limitations grounds is therefore DENIED.


C.   Breach of Fiduciary Duty

     Plaintiffs allege in their second cause of action that
Defendant owed a fiduciary duty to Plaintiffs given the "long and
enduring relationship between Arista and [the Rollers]," and that
Defendant breached this duty when it failed for over twenty-five
years to account for and pay Plaintiffs the royalties it owed
them.  (Am. Compl. ¶¶ 129-133)  Defendant argues that Plaintiffs'
claim for breach of fiduciary duty must be dismissed because the
Parties' relationship is not a fiduciary one, and as such,
Defendant breached no fiduciary duty to Plaintiffs.  (Def.'s Memo
of Law at 10)  Defendant further contends that Plaintiffs' breach

23

of fiduciary duty claim duplicates their breach of contract
claim, and is time-barred.  (Id.)

A claim for breach of fiduciary duty under New York law
requires the existence of a fiduciary duty and a breach of that
duty.  Muller-Paisner v. TIAA, 289 Fed.Appx. 461, 465 (2d Cir.
2008)  "A fiduciary relationship arises when one has reposed
trust or confidence in the integrity or fidelity of another who
thereby gains a resulting superiority of influence over the
first, or when one assumes control and responsibility over
another."  Cooper v. Sony Records Int'l, 2001 WL 1223492, at *5
(S.D.N.Y. Oct. 15, 2001); Reuben H. Donnelley Corp. v. Mark I
Marketing Corp., 893 F.Supp. 285, 289 (S.D.N.Y. 1995).  While "it
is not entirely clear when fiduciary duties arise out of a
contractual relationship," it is well-settled law that, "a
conventional business relationship does not create a fiduciary
relationship in the absence of additional factors."  Reuben H.
Donnelley Corp., 893 F.Supp. at 289.  "Generally, an arm's length
business transaction, even those where one party has superior
bargaining power, is not enough to give rise to a fiduciary
relationship."  Sony Music Entertainment, Inc. v. Robison, et al,
2002 WL 272406, at *3 (S.D.N.Y. Feb. 26, 2002), quoting Savage
Records Group, N.V. v. Jones, No. 600814/95 at 6-7 (N.Y.Sup.Ct.
July 17, 1997), aff'd, 667 N.Y.S.2d 906 (N.Y.App.Div.1998).

The existence of a fiduciary relationship is often a "fact-intensive" inquiry appropriate for a jury, see CBS Inc. v. Ahern, 108 F.R.D. 14, 26 & n21 (S.D.N.Y. 1985), however, conclusory allegations that a contractually-bound record company and recording artist shared a "long and enduring relationship . . . of trust and confidence" (Am. Compl. ¶ 131) are insufficient to plead a fiduciary relationship and survive a motion to dismiss. See Sony Music Entertainment, 2002 WL 272406, at *3 (artists' "assertions that they placed 'trust and confidence' in [record company] over the six years of their relationship . . . are not sufficient to create fiduciary duties in the absence of a special relationship"); Cooper, 2001 WL 1223492, at *5 ("Plaintiffs' conclusory allegations that a fiduciary duty was owed by [Defendant record company] cannot survive a motion to dismiss."); Mellencamp v. Riva Music Ltd., 698 F.Supp. 1154, 1160 (S.D.N.Y. 1988) ("since plaintiff's [breach of fiduciary duty claims] are predicated solely upon the professional relationship between the parties and do not plead any specific conduct or circumstances upon which trust elements are implicated, they are dismissed.").

Courts in this District have "repeatedly rejected the existence of a fiduciary relationship between recording artists and their record label," Sony Music Entertainment, Inc., 2002 WL 272406 at *3. Without "special circumstances," courts have routinely held that "no fiduciary relationship exists between a

25

music publisher and composer as a matter of law."  Cooper, 2001
WL 1223492 at *5; Carter v. Goodman Group Music Pub., 848 F.Supp.
438, 444 (S.D.N.Y. 1994).  The fact that a defendant record
company is contractually responsible for collecting royalties and
passing them on to a plaintiff music artist does not, in itself,
create a fiduciary relationship between parties.  Sony Music
Entertainment Inc., 2002 WL 272406 at *3; Rodgers v. Roulette
Records, Inc., 677 F.Supp. 731, 739 (S.D.N.Y. 1988).

To insulate their claim for breach of fiduciary duty against
the overwhelming tide of legal authority in this District against
it, Plaintiffs cite to Apple Records, Inc. v. Capital Records,
Inc., 137 A.D.2d 50, 529 N.Y.S.2d 279 (1st Dept. 1988).  In Apple
Records, plaintiffs, the individual members of the Beatles,
alleged breach of fiduciary duty and other claims against their
record companies, Capitol Records, Inc. and EMI Records, pursuant
to licensing and manufacturing and distributing agreements
between the parties.  Apple Records, 137 A.D.2d at 52-53.  The
Supreme Court of New York, Appellate Division, in reviewing the
lower court's decision granting in part and denying in part
defendants' motion to dismiss Plaintiffs' claims, and denying, in
pertinent part, defendants' motion to dismiss plaintiffs' claim
of breach of fiduciary duty, noted that,

> "In upholding the sixth cause of action for breach of
> fiduciary duties, the motion court acknowledged that
> while the contract did not establish a formal fiduciary

relationship, the pleadings were sufficient to raise an
issue as to the existence of an informal one . . ."

Id. at 57.  The appellate court went on to review the facts in
the pleadings that had led the lower court to such a conclusion,
noting that "[a] fiduciary relationship, whether formal or
informal, 'is one founded upon trust or confidence . . . [and]
might be found to exist, in appropriate circumstances, between
close friends, or even where confidence is based upon prior
business dealings," id. (citations omitted) (emphasis added),
explaining that:

> "The business dealings between Capitol Records and the
> Beatles date back to 1962, when the still unacclaimed
> Beatles entrusted their musical talents to defendant
> Capitol Records.  It is alleged that this relationship
> proved so profitable to defendant that at one point the
> Beatles constituted 25 to 30 percent of its business.
> Even after the Beatles attained their remarkable degree
> of popularity and success, they continued to rely on
> Capitol Records for the manufacture and sale of their
> recordings."

Id.  The court concluded, in pertinent part, that "it can be
said that from such a long enduring relationship [between
parties] was borne a special relationship of trust and
confidence" sufficient to convert it from a conventional, arm's
length business relationship to a fiduciary one.  Id.

Given the unprecedented facts of that case, Apple Records
stands as the exception to the general rule that a fiduciary
relationship does not exist between recording artists and their
record companies under New York law, and thus is of little

27

precedential value to these or other plaintiffs.  See Sony Music

Entertainment Inc., 2002 WL 272406, at *3 (finding Apple Records

"distinguishable . . . . in the absence of a special

relationship"); Cooper v. Sony Records Int'l, 2001 WL 1223492,

*5, n10 (S.D.N.Y. Oct 15, 2001) (finding that "[u]nlike Apple

Records, here there is no assertion of a special relationship

beyond that which normally exists between contracting parties in

an arms-length transaction.").  While this Court is aware of

certain factual similarities[3] that do exist between Plaintiffs'

case and the Beatles' in Apple Records, the Court finds notably

absent those facts that led the New York Supreme Court and

Appellate Court to conclude that a "special relationship of trust

and confidence" had developed between the Beatles and their

record companies such that a fiduciary relationship was created.

---

[3] Plaintiffs entered into their first agreement with Arista's
predecessor, Bell Records, when they were relative unknowns.  (Am.
Compl. ¶ 16)  Within a few years of first signing with Defendant in
1971, the Rollers "released a string of highly successful singles,"
and by 1975, the year they signed their second contract with
Arista, the Rollers' success in the UK had "spread to the rest of
the world."  (Id. ¶¶ 18 & 23)  Plaintiffs allege that their
contract with Arista was so profitable to the company that "Arista
has generated millions of dollars from the Rollers through the sale
of albums, compact discs . . . licenses, digital transmissions,
ringtones, and other rights and licenses."  (Id. ¶ 35)  Indeed,
Plaintiffs continued to rely on Arista for the licensing of their
records through and well after the rise and fall of their
popularity; Plaintiffs brought this action over thirty years after
signing their original agreement with Defendant's predecessor and
twenty-six years after the band's break-up.  (Id. ¶¶ 29)  All this
time, Plaintiffs allege, Arista has "never made the payments
required under [the 1981 Agreement at issue in this action] or any
other agreement" between the Parties, but "[has] been holding all
the funds owed" for over twenty-five years.  (Id. ¶¶ 68 & 80)

28

In contrast to the business dealings between the Beatles, Capitol Records, and EMI, there are no facts here to suggest that the dealings between the Rollers and Arista were anything other or more than garden-variety arm's length transactions.  This Court notes, in fact, that Plaintiffs were represented by a intermediary, pass-through corporate entity, ALK, in their second agreement with Defendant in 1975, to best "protect [their] interests."  (Am. Compl. ¶ 46)  These differences prevent the Court from sustaining Plaintiffs' claim for breach of fiduciary duty against Defendant's motion to dismiss under Apple Records.

Because the Court finds that no fiduciary relationship existed between Parties, it need not address Defendant's additional arguments against Plaintiffs' claim for breach of fiduciary duty.  Defendant's motion to dismiss Plaintiffs' claim for breach of fiduciary duty is GRANTED.

## C.   Constructive Trust

Defendant further moves to dismiss Plaintiffs' action to impose a constructive trust in favor of the Rollers to prevent unjust enrichment by Arista.  Under New York law, a party seeking a constructive trust must establish four elements: (1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer made in reliance on that promise; and (4) unjust enrichment.  See, e.g., Cooper, 2001 WL 1223492 at *5.  As the Court has already found that no fiduciary relationship exists

between these Parties, Plaintiffs' claim for a constructive trust fails as a matter of law.  Defendant's motion to dismiss Plaintiffs' constructive trust claim is GRANTED.

## D.   Accounting

Plaintiffs' fourth claim for an accounting of Arista's financial affairs as they pertain to the agreements between Parties likewise fails given the absence of a fiduciary relationship in this case.  Proof of a fiduciary relationship is a mandatory element of an accounting claim under New York law. See, e.g., Rodgers, 677 F.Supp. at 738-739.  Defendant's motion to dismiss Plaintiffs' accounting claim is therefore GRANTED.

## III. CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss is DENIED as to Plaintiffs' breach of contract claim and GRANTED as to Plaintiffs' claims of breach of fiduciary duty, constructive trust, and accounting.  Defendant shall answer the first and sole remaining claim of Plaintiffs' First Amended Complaint within thirty (30) days of the date of this Memorandum and Order.

SO ORDERED.

Dated:    New York, New York
          March 5, 2009

                              _Deborah A. Batts_
                              Deborah A. Batts
                              United States District Judge