UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -X

ERIC FAULKNER, DUNCAN FAURE,          :
ALAN LONGMUIR, DEREK LONGMUIR,        :
LESLIE MCKEOWN and STUART WOOD,       :
                                      :
          Plaintiffs,                 :
                                      :
     v.                               :
                                      :
ARISTA RECORDS LLC,                   :
                                      :
          Defendant.                  :
- - - - - - - - - - - - - - - - - -X

**UNDER SEAL**

07 Civ. 2318 (LAP)

OPINION AND ORDER



LORETTA A. PRESKA, Chief United States District Judge:

          Plaintiffs Eric Faulkner, Duncan Faure, Alan Longmuir,

Derek Longmuir, Leslie McKeown and Stuart Wood, all former

members of 1970s-era musical group the Bay City Rollers

(collectively, "Plaintiffs" or the "Rollers"), brought this

action alleging that they were owed tens of millions of dollars

in unpaid royalties from their record company, Defendant Arista

Records, LLC ("Arista").  Plaintiffs claim these royalties

pursuant to a 1981 agreement; accordingly, Arista argues that

even if it owes Plaintiffs accrued royalties from the time

period prior to 2001, the statute of limitations bars

Plaintiffs' claim.  Plaintiffs counter that Arista acknowledged

its debt in a writing, thereby satisfying Section 17-101 of New

York's General Obligations Law, which restarts the statute of

limitations to revive the debt.

Plaintiffs and Arista have each moved for partial summary judgment on Arista's affirmative defense that the statute of limitations bars Plaintiffs' claim.  For the following reasons, Plaintiffs' motion for partial summary judgment is GRANTED, and Defendant's motion for partial summary judgment is DENIED.

In addition, Plaintiffs have moved to strike certain exhibits provided by Arista in the Declaration of Prana A. Topper submitted by Arista in support of its Motion for Summary Judgment.[1]  For the following reasons, the motion to strike is GRANTED in part and DENIED in part.

---

[1] The parties rely upon the following submissions and exhibits attached thereto:  First Amended Complaint dated July 13, 2007 ("Am. Compl."); Joint Rule 26(f) Report dated June 11, 2009 ("Rule 26(f) Report"); Memorandum of Law in Support of Defendant Arista Records LLC's Motion for Partial Summary Judgment dated March 5, 2010 ("Def. Mem."); Defendant Arista Records LLC's Statement Pursuant to Local Rule 56.1 ("Def. 56.1 Stmt."); Declaration of Prana A. Topper in Support of Arista Records LLC's Motion for Partial Summary Judgment, sworn to March 5, 2010 ("Topper Declaration" or "Topper Decl."); Memorandum of Law in Support of Plaintiffs' Cross-Motion for Partial Summary Judgment and in Opposition to Defendant Arista Records, LLC's Motion for Partial Summary Judgment dated March 23, 2010 ("Pl. Mem."); Plaintiffs' Response to Arista Records LLC's Statement Pursuant to Local Rule 56.1 dated March 23, 2010 ("Pl. 56.1 Resp."); Declaration of David Donoghue in Support of Plaintiffs' Cross-Motion for Summary Judgment and in Opposition to Defendant Arista Records, LLC's Motion for Partial Summary Judgment, sworn to March 23, 2010 ("Donoghue Declaration" or "Donoghue Decl."); Declaration of William Sobel in Support of Plaintiffs' Cross-Motion for Summary Judgment and in Opposition to Defendant Arista Records LLC's Motion for Partial Summary Judgment, sworn to March 22, 2010 ("Sobel Declaration" or "Sobel Decl."); (Cont'd)

I.   Motions to Strike

Plaintiffs move to strike Exhibits 5, 6, 7, 8, 10, 12, 14, 15, and 17 to the Topper Declaration on the basis that they are unauthenticated.  In addition, they move to strike Paragraphs 4, 7, 25-29, 35, 37-38, 41, 42 and 44 of Arista's Local Rule 56.1 Statement because those Paragraphs rely on the challenged exhibits.  Plaintiffs also move to strike Exhibits 26, 34, 40, 44, 45, and 46 to the Topper Declaration based on an

---

(Cont'd from previous page)
Declaration of Mark St. John in Support of Plaintiffs' Cross-Motion for Summary Judgment and in Opposition to Defendant Arista Records, LLC's Motion for Partial Summary Judgment, sworn to March 22, 2010 ("St. John Declaration" or "St. John Decl."); Memorandum of Law in Support of Plaintiffs' Motion to Strike Certain Inadmissible Evidence Attached to the Declaration of Prana A. Topper, dated March 23, 2010 ("Strike Mem."); Plaintiffs' Local Rule 56.1 Statement of Undisputed Material Facts ("Pl. 56.1 Stmt."); Defendant Arista Records LLC's Response to Plaintiffs' Local Rule 56.1 Statement of Undisputed Material Facts dated April 30, 2010 ("Def. 56.1 Resp."); Memorandum of Law in Further Support of Arista Records LLC's Motion for Partial Summary Judgment and in Opposition to Plaintiffs' Motion for Partial Summary Judgment dated April 30, 2010 ("Def. Reply"); Arista Records LLC's Memorandum of Law in Opposition to Plaintiffs' Motion to Strike, dated April 30, 2010 ("Strike Opp."); Declaration of Prana A. Topper in Further Support of Arista Records LLC's Motion for Partial Summary Judgment and in Opposition to Plaintiffs' Motion for Partial Summary Judgment and Motion to Strike ("Supplemental Topper Declaration" or "Supp. Topper Decl."); Memorandum of Law in Further Support of Plaintiffs' Cross-Motion for Summary Judgment dated May 14, 2010 ("Pl. Reply"); Declaration of David Donoghue in Support of Reply in Further Support of Cross-Motion for Partial Summary Judgment and Reply in Support of Motion to Strike Certain Inadmissible Evidence ("Supplemental Donoghue Declaration" or "Supp. Donoghue Decl."); Transcript of Oral Argument held September 15, 2010 ("Tr.").

alleged reliance on inadmissible hearsay.  Accordingly, they move to strike Paragraphs 21, 22, 25, 26, 28, 33, 39, 45, 61, 63-67, 81-83, and 99 of Arista's 56.1 Statement because those Paragraphs rely on the challenged exhibits.

    A.   Legal Standard

    "Because a decision on the motion to strike may affect [a movant's] ability to prevail on summary judgment, it is appropriate to consider the Motion to Strike prior to [the parties' motions for partial] summary judgment."  See Century Pacific, Inc. v. Hilton Hotels Corp., 528 F. Supp. 2d 206, 213 (S.D.N.Y. 2007) (internal quotation marks omitted).

    Rule 56(c)(4) of the Federal Rules of Civil Procedure requires that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  Local Civil Rule 56.1 requires that a party seeking summary judgment under Federal Rule of Civil Procedure 56 include a statement of those material facts as to which the moving party contends there is no genuine issue to be tried.  Each statement of material fact must be followed by a "citation to evidence which would be admissible, set forth as required by the Federal Rule of Civil Procedure

56(e)."  L.R. 56.1.[2]  It is therefore the rule that "only

admissible evidence" need be considered on summary judgment.

Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997).  "The

principles governing admissibility of evidence do not change on

a motion for summary judgment."  Id.

     B.   Analysis

       1. Hearsay

         a. Topper Decl. Ex. 26 ("Exhibit 26); Def.

           56.1 Stmt. ¶¶ 25, 26, 28, 33, 39, 45, 61

Plaintiffs assert that the statements upon which

Arista relies in Exhibit 26, a letter from Glenn Delgado to Mark

St. John, are inadmissible hearsay.  (Strike Mem. at 3.)  Arista

contends that the statements are admissible under Federal Rule

of Evidence 803(3) as evidence of Delgado's state of mind and

intent.

Every statement in Arista's Local Rule 56.1 Statement

that relies upon Exhibit 26 presents Delgado's recitations of

the parties' alleged past conduct as undisputed fact.  (E.g.,

Def. 56.1 Stmt. ¶ 25 ("ARI and representatives of plaintiffs and

_____

[2] Amendments to the Federal Rules of Civil Procedure became
effective December 1, 2010, while these motions were pending.
Rule 56(e) was renumbered as Rule 56(c)(4); while the wording of
the Rule was slightly changed, the Committee's notes state that
"Subdivision (c)(4) carries forward some of the provisions of
the former subdivision (e)(1)."  The Local Rules have not yet
been updated to reflect this renumbering.

the BCR Entities discussed a possible settlement of the Main Audit claim in or around 1982 (Ex. 6; Ex. 26 at ARB003060)"); ¶ 26 ("ARI offered to pay $73,839.52 to settle the claim ('Audit Settlement Amount'), but no agreement was reached. ([Ex. 6; Ex. 26 at ARB003060]"); ¶ 28 ("In or around May 1982, ARI received a letter signed by three of the plaintiffs . . . .  (Ex. 7; Ex. 8; Ex. 26 at ARB003059)")).  Mr. Delgado's state of mind is not addressed in any of these statements, making it clear that Exhibit 26 is being used not to demonstrate his state of mind or intent but to prove the truth of the matters Delgado asserted in his letter.  The letter is not admissible for that purpose. Plaintiffs' motion is granted as to Exhibit 26 to the extent that Arista uses it to prove that the events recounted within the letter occurred.

The statements in Defendant's L.R. 56.1 Statement that rely upon Exhibit 26 are not relevant to the analysis of these cross-motions for summary judgment; accordingly, Plaintiffs' Motion to Strike is denied as moot as to those statements.

b. Topper Decl. Ex. 40; Def. 56.1 Stmt.
¶¶ 21-22

The parties disagree as to whether Exhibit 40 to the Topper Declaration, two pages from a book by Plaintiff Leslie McKeown, constitutes admissible hearsay under Article VIII of the Federal Rules of Evidence to prove whether the Bay City

Rollers had any hits after 1977.  (See Strike Mem. at 5-6;
Strike Opp. at 7.)  Both parties miss the mark.  While no doubt
of great interest to the observer of popular culture or the
trivia lover, the questions of whether the Bay City Rollers had
hits after 1977 and whether the Rollers' album "Strangers in the
Wind" failed to chart in the United States in 1978 (see Def.
56.1 Stmt. ¶ 22) are completely irrelevant to any legal issue in
this case, let alone the issue of whether Arista communicated a
written acknowledgement of its debt in the six years prior to
the filing of this lawsuit, which occurred March 20, 2007.
Exhibit 40 to the Topper Declaration is inadmissible as
irrelevant pursuant to Federal Rule of Evidence 402, and
Plaintiffs' Motion to Strike is granted as to Exhibit 40 and
Paragraphs 21-22 of Arista's 56.1 Statement.

c. Topper Decl. 34, 44-46; Def. 56.1 Stmt.
¶¶ 39, 63-67, 81-83, and 99

The remainder of the exhibits and statements
Plaintiffs seek to strike are unnecessary to the determination
of these cross-motions for summary judgment.  Accordingly, the
Motion to Strike is denied as moot as to Exhibits 34, 44, 45,
and 46 to the Topper Declaration, and to Paragraphs 39, 63, 64,
65, 66, 67, 81, 82, 83, and 99 of Arista's Local Rule 56.1
Statement.

2. Authentication

Plaintiffs move to strike Exhibits 5-8, 10, 12, 14, 15, and 17 to the Topper Declaration, as well as those statements in Arista's Local Rule 56.1 Statement of Undisputed Facts that rely on those Exhibits, claiming that they are unauthenticated.

Exhibits 5, 6, 8, 10, 12, and 14 are all Bates-stamped with the prefix "BCR," which demonstrates that they were produced by Plaintiff during discovery.  (Strike Opp. at 2.) Plaintiffs have not claimed that these documents are not authentic but merely asserted that Arista has not provided proper authentication in the form of custodian affidavits. (Strike Mem. at 6.)  This objection is emblematic of the gamesmanship that both sides have demonstrated throughout this litigation and is simply premised on the fact that Arista has not gone to the trouble and expense of obtaining authenticating affidavits for the creator, custodian or recipient of each and every document produced by Plaintiffs.  Moreover, each of these documents bears more than sufficient circumstantial evidence of authenticity to satisfy Federal Rule of Evidence 901(b)(4), and many of them were authenticated by Plaintiffs during depositions.  (See Strike Opp. Attachment A; see also Supp. Topper Decl.)  Plaintiffs acknowledged at oral argument that although they produced the documents, their clients were not certain of the provenance of those documents and did not wish to

be "acknowledg[e] things [they] were not really sure how they came about or where they went."  (Tr. at 57:7-8.)

Given that Plaintiffs produced the documents and are thus in the best position to know whether they are indeed authentic (as they appear to be), this portion of the Motion to Strike teeters on the edge of sanctionable.  See, e.g., Commercial Data Servers, Inc. v. IBM Corp., 262 F. Supp. 2d 50, 58 n.3 (S.D.N.Y. 2003).  Plaintiffs have apparently failed to keep adequate records of the documents they created or received during their relationship with Arista.  That failure is no reason to burden Defendant (or this Court) with a meritless motion to strike.[3]  The object of summary judgment is to save litigation costs, not to drive them up in an attempt to avoid the consequences of clients' recordkeeping.

Plaintiffs' Motion to Strike is denied as to Exhibits 5-8, 10, 12, 14, 15, and 17 to the Topper Declaration and the corresponding statements in Defendant's L.R. 56.1 Statement.

II.   Rule 56(f) Motion

---

[3] Similarly, Exhibit 7 is a letter to Arista signed by Plaintiffs Faulkner, Derek Longmuir, and Alan Longmuir.  Plaintiffs do not deny that this letter contains their signatures.  Finally, Exhibits 15 and 17 are summonses related to the 1993 interpleader action.  Both documents specifically name Plaintiffs here as defendants in that action.  Again, Plaintiffs' failure to keep track of their own business dealings is no reason to burden the Court with a meritless motion to strike.

Plaintiffs' application pursuant to Rule 56(f) is denied.[4]  Plaintiffs claim that "discovery is incomplete" and thus that summary judgment for Arista is inappropriate.  An application under Rule 56(f) may not be granted unless the party seeking relief under that Rule submits an affidavit demonstrating: "[1] the nature of the uncompleted discovery; [2] how the facts sought are reasonably expected to create a genuine issue of material fact; [3] what efforts the affiant has made to obtain those facts; and [4] why those efforts were unsuccessful." Paddington Partners v. Bouchard, 34 F.3d 1132, 1138 (2d Cir. 1994).

Plaintiffs have not met the second prong of the test. The Donoghue Declaration provides three examples of Arista's allegedly deficient disclosure.  First, Exhibit 7 to the Topper Declaration is a letter purporting to be from Alan Longmuir, Derek Longmuir, and Eric Faulkner to Arista's predecessor-in-interest, Arista Records Inc. ("ARI"), in which those three Plaintiffs ask Arista to transfer their monies to designated bank accounts.  (Donoghue Decl. ¶ 20 (citing Def. 56.1 Stmt. ¶ 28).)  The Donoghue Declaration argues that Arista "presumably

---

[4] As previously noted, amendments to the Federal Rules of Civil Procedure became effective while these motions were pending. Rule 56(f) was renumbered as Rule 56(d); while the wording of the Rule was slightly changed, the Committee's notes state that "Subdivision (d) carries forward without substantial change the provisions of the former subdivision (f)."

produced this document to claim that . . . it properly put a hold on royalty payments." (Id. (citing Def. 56.1 Stmt. ¶ 33).) This letter came from Plaintiffs and is thus within their knowledge. Plaintiffs make no argument that additional facts would assist in countering this proposition, and because the sole document Plaintiffs cite in support of their contention that Arista is making an impermissible argument regarding its hold on royalty payments is a document that Plaintiffs themselves produced, they cannot credibly claim to be prejudiced by a lack of discovery.

Second, the Donoghue Declaration notes that Arista produced "numerous documents from 1993 and 1994 specifically addressing its interpleader action" but that "[u]pon information and belief . . . [the] production is devoid of documents for the intervening years, from 1983 through 1991." (Donoghue Decl. ¶ 20.) Putting aside the question of whether a statement in an affidavit made on information and belief that does not provide the source of said information may serve as the basis for a valid Rule 56(f) motion, the Donoghue Declaration does not provide information about what facts it seeks to counter. It merely notes that Arista's production is devoid of any documents from the years between 1983 and 1991. (Id.) That statement is insufficient to satisfy the plain language of Rule 56(f).

The third point made in the Donoghue Declaration is that Arista seeks summary judgment on three audits prior to 1998 (Id. ¶ 21.) but has produced no documents relevant to that issue.  The validity of the audits is not at issue on these cross-motions.  In fact, as discussed in greater depth infra, most (though not all) of the pre-1998 material proffered by Arista is nothing but the smoke from another fire; such information may very well come into play in the liability/damages phase of this litigation, but it is not relevant to the determination of whether Arista's debt to Plaintiffs has been revived.  Accordingly, Plaintiffs' Rule 56(f) application is denied.

### III. Partial Summary Judgment Cross-Motions

#### A. Background

The parties seemingly disagree on almost everything, but the following facts are not in dispute.  Plaintiffs are former members of the Bay City Rollers, a musical group that had its heyday in the 1970s.  In 1975, Arista's predecessor-in-interest, ARI, entered into an agreement ("1975 Agreement") with a production company called A.L.K. Enterprises, Inc. ("ALK") for the exclusive recording services of the Bay City Rollers.  (Pl. 56.1 Stmt. ¶ 1; Def. 56.1 Stmt. ¶ 1.)  The Rollers, at the time composed of Faulkner, Wood, Alan Longmuir, Derek Longmuir, and McKeown, agreed in writing to be bound by the 1975 Agreement.

(Def. 56.1 Stmt. ¶ 2.)  McKeown later left the Rollers and was replaced by Faure (Def. 56.1 Stmt. ¶ 23), who also consented to be bound by the 1975 Agreement (Def. 56.1 Stmt. ¶ 4).

Following the 1975 Agreement, ALK conducted a number of audits of the books and records of ARI, though the parties disagree on how many audits were conducted – Plaintiffs allege that they conducted three audits, while Defendant concedes only two audits.  (Pl. 56.1 Resp. ¶¶ 5-11; Def. 56.1 Stmt. ¶ 11.)

1. 1981 Agreement

In 1981, Plaintiffs, ALK, and Plaintiffs' corporate entities entered into an agreement (the "1981 Agreement") with ARI.  (Pl. 56.1 Stmt. ¶ 3.[5])  Pursuant to the 1981 Agreement, Plaintiffs and their respective corporate entities assumed all of ALK's rights and obligations under the 1975 Agreement.  (Pl. 56.1 Stmt. ¶ 4.)  The 1981 Agreement also designated payee information for any royalties owed to the Rollers and carved out special provisions for the two audits ALK had previously conducted.  (Topper Decl. Ex. 1 ¶ 4.)  The 1981 Agreement provided that it could not be modified "except by an instrument in writing, signed by each of the parties duly authorized to

---

[5] In its Response to Plaintiffs' Local Rule 56.1 Statement (see Def. 56.1 Resp. ¶ 3), Arista objects to the characterization of the corporate entities as Plaintiffs' "respective personal corporations," but that is precisely the language used by one of Arista's corporate representatives in correspondence.  (See Topper Decl. Ex. 30.)

execute such modification." (Topper Decl. Ex. 1 ¶ 7.) Arista subsequently was formed and took over ARI's rights and obligations under the 1981 Agreement. (Def. 56.1 Stmt. ¶ 13.)

The Bay City Rollers broke up in 1981. (Def. 56.1 Stmt. ¶ 24.) Plaintiff McKeown subsequently engaged in litigation with the other members of the Bay City Rollers regarding the proper division of royalties. (Topper Decl. Ex. 10; Ex. 63 (McKeown Dep. Tr.) at 28:7-29:12.) In addition, the law firm designated in the 1981 Agreement relocated, but Arista did not receive a notification of the law firm's address change "in writing, signed by each of the parties duly authorized to execute such modification." (Def. 56.1 Stmt. ¶¶ 15, 30; Pl. 56.1 Resp. ¶¶ 15, 30.) Though the parties dispute the reasoning behind the hold, Arista stopped making regular royalty payments no later than 1982. (Def. 56.1 Stmt. ¶ 33 ("ARI placed a hold on BCR accountings and royalty payments as of the accounting period ending December 31, 1982."); Pl. 56.1 Resp. ¶ 33 ("The Plaintiffs admit they were never paid anything by Arista Records, Inc., the Defendant or any other party pursuant to the 1981 Agreement until September 1997.").)

Following the cessation of royalty payments, the parties engaged in years of back-and-forth regarding the proper amounts to pay and the proper payees, with Arista going so far as to threaten, and then file, an interpleader action in New

York Supreme Court in 1993.   (Def. 56.1 Stmt. ¶¶ 35-37, 41, 42; Topper Decl. Exs. 11, 13, 14, 15.)

Arista and an agent for all Plaintiffs except Faure began negotiating a payment of royalties:  Arista describes these negotiations as "an effort to settle the issues underlying the Interpleader Action," while Plaintiffs describe the negotiations as directed simply toward the payment of undisputed royalties.  (See Def. 56.1 Stmt. ¶ 46; Pl. 56.1 Resp. ¶ 46.) Arista sent a payment to the Rollers pursuant to the Agreement in 1997.  (See Pl. 56.1 Stmt. ¶ 13; Topper Decl. Ex. 22.)  The parties dispute whether this payment was meant to settle all accounts, as Arista asserts (see Def. 56.1 Stmt. ¶ 51; Topper Decl. Ex. 47 (Zizza Dep. Tr.) at 83:20-25, 84:15-17), or instead was an interim payment and not intended to be a full payment for all Royalties, as Plaintiffs argue (Pl. 56.1 Stmt. ¶ 15; Pl. 56.1 Resp. ¶ 46.)

### 2. Delgado Letters

In 2001, an individual affiliated with Plaintiffs, Mark St. John ("St. John"), sent a series of letters to Arista, some of which threatened litigation.  (Pl. 56.1 Stmt. ¶ 23; Def. 56.1 Stmt. ¶ 54.)  Arista's in-house counsel, Glenn Delgado ("Delgado"), began communicating with St. John.  (Pl. 56.1 Stmt. ¶ 23; Def. 56.1 Stmt. ¶ 54.)  St. John sent Delgado several letters in which he attacked Arista's attempt to settle the

dispute between the Rollers and Arista.   (Pl. 56.1 Stmt. ¶ 25; Topper Decl. Exs. 24, 25 ("Throughout all of this Arista has been divisive, unclear, unresponsive and downright untruthful.").)

Delgado sent St. John a letter on November 1, 2001 (the "2001 Letter"), in which he stated in relevant part:

> Arista remains committed to resolving all of the outstanding issues with the Rollers, in a fair and amicable way.  To that end, Arista would be willing to pay the Rollers all accrued royalties and the amount Arista conceded to in connection with the audit, provided Arista receives a correct change of address/payee letter signed by all of the parties in accordance with the terms of [sic] 1981 Agreement.
> . . .
> Please understand that this letter is intended to facilitate settlement discussions and is not intended to be a full statement of all the facts and circumstances concerning this matter or a waiver of any of Arista's rights or remedies, all of which are hereby expressly reserved.

(Topper Decl. Ex. 26 at ARB3060-61.)   The parties dispute whether St. John informed Plaintiffs of Delgado's stated position.   (See Def. 56.1 Resp. ¶ 27; St. John Decl. ¶ 19.) Arista also disputes that St. John represented Faure and that they had written notice of his representation.   (See Def. 56.1 Resp. ¶ 22.)   Arista does not, however, dispute that Delgado sent the letter to St. John in an attempt to influence Plaintiffs' conduct and avoid litigation.   (See Def. 56.1 Stmt. ¶ 54 ("Delgado . . . attempted to settle the BCR royalty dispute . . . .").)

Delgado sent another letter to St. John on January 9, 2002 (the "2002 Letter"), which stated in relevant part:

> I note that this matter is not a money issue or due to Arista's failure to account and pay the Rollers. Rather, it is due to a dispute among the members of the Rollers concerning the payee of royalties under the settlement agreements between Arista and the fourteen (14) separate parties comprising the members of the Rollers and their respective corporate entities . . . . Arista would be more than willing to pay all accrued royalties to the correct payees, provided we receive correct payee information, in accordance with the specific terms of the 1981 Agreements.
> . . .
> Additionally, please understand that this letter is intended to facilitate settlement discussions and is not intended to be a full statement of all the facts and circumstances concerning this matter or a waiver of any of Arista's rights or remedies, all of which are hereby expressly reserved.

(Topper Decl. Ex. 30.)

On August 17, 2007, after this suit was filed, Plaintiffs' counsel sent a letter to counsel for Arista referencing Arista's stated condition for payment of accrued royalties of "a correct change of address/payee letter signed by all of the parties in accordance with the terms of [their] 1981 Agreement." (Topper Decl. Ex. 39.) The letter further enclosed a "notice of 'change of address/payee letter'" and concluded that the notice "satisfies the 'conditions' requested by Arista." (Id.)

### 3. Gawley Email

As of early 2004, Arista believed that a television producer named Jane Preston ("Preston") was creating a documentary on the Rollers that would focus in part on the royalty dispute between the Rollers and Arista. (Def. 56.1 Stmt. ¶ 74.)  Steve Gawley ("Gawley"), an in-house lawyer at Arista, sent Preston an email (the "Gawley Email") on April 6, 2004. (Def. 56.1 Stmt. ¶ 76.)  The Gawley Email was not sent to Plaintiffs before the commencement of this lawsuit.  (Def. 56.1 Stmt. ¶¶ 76, 78, 79.)  In the email, Gawley stated that "infighting among the various members of the Bay City Rollers has made Arista legally unable to pay royalties to the appropriate parties.  Arista has always stood ready to pay royalties whenever the Rollers were able to agree among themselves as to who are the appropriate payees."  (Topper Decl. Ex. 34 at ARB 004247.)  The Gawley Email further states, "Arista has always maintained and made clear that we would pay any earned royalties to the appropriate parties."  (Id. at ARB 004248.)

Around the time that the Gawley Email was sent, Gawley, Preston, and Delgado participated in a telephone conference call.[6]  (See Donoghue Decl. ¶¶ 4-5; Ex. B.)  According to the transcripts provided by Plaintiffs, Gawley stated that he

---

[6] Defendant's objections to the admissibility of the Preston Transcript are addressed infra in Section III.B.3.a.

believed Preston was in contact with Plaintiffs.  (Donoghue Decl. Ex. B at BCRP0002059, BCRP0002065.)  Gawley also said to Preston that "we'll throw a challenge out to you Jane and through your programme you can get the Bay City Rollers to agree who we should pay, we'll pay.  Because . . . we're happy to do it."  (Id. at BCRP0002043.)

### 4. KPMG Memorandum

Plaintiffs also present a draft memorandum dated September 27, 2004 (the "KPMG Memorandum") from Arista's auditor, KPMG, which was to be sent on Arista's behalf to St. John.  (Topper Decl. Ex. 58 at ARB003453.)  In substance, the KPMG Memorandum noted that Arista had been unable to obtain agreement on the correct payees for royalties and stated that "BMG [Arista's parent company] has accordingly made provision in its accounts for such payments and for subsequent royalties." (Id.)  The KPMG Memorandum was produced along with an email from Emio Zizza, which gave a KPMG employee the "okay" to send the letter.  (See id. at ARB003451; Tr. at 42:1-24.)  Defendant disputes that the email from Zizza approved the KPMG Memorandum, but the fact that the letter was produced along with the email leads to an inference that it was indeed approved by Zizza, despite the fact that he testified that he did not remember approving the letter.  (See Topper Decl. Ex. 67 (Zizza Dep. Tr.) at 227:9-228:2.)  Despite Zizza's apparent approval of the KPMG

Memorandum, Plaintiffs produced no evidence that it was ever sent, and neither the Plaintiffs nor McKeown testified to having received the KPMG Memorandum.

B. Legal Standard

1. Summary Judgment

A party is entitled to summary judgment only "if the pleadings, depositions, answers to interrogatories, and the admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting former Fed. R. Civ. P. 56(c)).[7] A fact is "material" if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.; see also Overton v. N.Y. State Div. of Military & Naval Affairs, 373 F.3d 83, 89 (2d Cir. 2004). On cross-motions for summary judgment "neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it. Here, each party has moved for

---

[7] As previously noted, recent amendments to the Federal Rules of Civil Procedure became effective while these motions were pending. Rule 56(c) was renumbered as Rule 56(a); while the wording of the Rule was slightly changed, the Committee's notes state that "Subdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c)."

summary judgment.  When faced with cross-motions for summary judgment, a district court is not required to grant judgment as a matter of law for one side or the other." Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993).

2. New York General Obligations Law Section 17-101

Section 17-101 of New York's General Obligations Law ("Section 17-101") codifies and restricts the common-law rule that an acknowledgement of a debt is sufficient to refresh the obligation, thereby restarting the running of the statute of limitations.  See, e.g., Lew Morris Demolition Co. v. Bd. of Educ. of City of N.Y., 355 N.E.2d 369, 371 (N.Y. 1976).  The statute states in relevant part that "[a]n acknowledgment or promise contained in a writing signed by the party to be charged thereby is the only competent evidence of a new or continuing contract whereby to take an action out of the operation of the provisions of limitations of time for commencing actions under the civil practice law and rules." N.Y. Gen. Oblig. Law § 17-101.  The parties agree that New York's statute of limitations to enforce a contractual obligation is six years.  N.Y. C.P.L.R. § 213 (2006); Lynford v. Williams, 826 N.Y.2d 335, 337 (N.Y. App. Div. 2006).

To restart the running of the statute of limitations under Section 17-101, an acknowledgment or promise must be in writing, be signed by the debtor party, "recognize an existing

debt and contain nothing inconsistent with an intention on the part of the debtor to pay it." GP Hemisphere Assocs., L.L.C., v. The Republic of Nicar., No. 99 Civ. 10302, 2000 WL 1457025, at *3 (S.D.N.Y. Sept. 28, 2000) (internal quotations omitted) (interpreting New York law); Lew Morris Demolition, 355 N.E.2d at 371. "In determining an acknowledgement's effectiveness 'there is no occasion for resorting to any subtle or refined distinctions contrary to ordinary business understanding and rules of common sense.'" Estate of Vengroski v. Garden Inn, 114 A.D.2d 927, 928, 495 N.Y.S.2d 200, 201-02 (N.Y. App. Div. 1985) (citing Curtiss-Wright Corp. v. Intercontinent Corp., 277 A.D. 13, 17, 97 N.Y.S.2d 678, 682 (N.Y. App. Div. 1950)). The acknowledgement must have been communicated to the plaintiff or someone acting on his behalf, or intended to influence the plaintiff's conduct. Lynford, 826 N.Y.S.2d at 377.

If a written promise or acknowledgement is not unconditional but instead is contingent upon some future event, the creditor has the burden of proving that the condition has been met. See, e.g., Flynn v. Flynn, 572 N.Y.S.2d 307, 309 (N.Y. App. Div. 1991); see also In re Brill, 318 B.R. 49, 54 (Bankr. S.D.N.Y. 2004).

### a. Analysis

#### 1. A General Acknowledgement Suffices To Trigger Section 17-101

Arista asserts that because Plaintiffs have undertaken multiple audits over the years, each of which has given rise to a specific dollar amount that Plaintiffs claim Arista owes, each audit constitutes a specific debt that must be explicitly acknowledged in order for Section 17-101 to take effect.   (Tr. at 14:23-16:21 ("There are three audited claims and one claim for the unaudited amounts.   They are actually very different; one is liquidated, it's certain, and the other is not . . . [i]t goes to whether 17-101 applies . . . ."))

Arista bases its argument upon Zinn v. Stamm, 152 A.D. 76, 136 N.Y.S. 737 (N.Y. App. Div. 1912).   (See Tr. at 8:24.) In Zinn, the First Department of New York State's Appellate Division held that under a precursor statute to Section 17-101, a general acknowledgement that the defendant was indebted to the plaintiff was insufficient to take the debt out of the statute of limitations where the defendant owed the plaintiff multiple independent debts.   136 N.Y.S. at 740 ("[T]he rule is well settled that where a creditor has several claims against which the statute has run, then the acknowledgment or promise in the writing must indicate the particular claim to which it refers; that a general acknowledgment of an indebtedness, there being several claims, is insufficient.").

The flaw in Arista's argument is demonstrated by the reasoning of the Zinn court.

Here the letters undoutbedly [sic] acknowledge the
existence of an indebtedness from which the law
implies a promise to pay, in the absence of a
statement inconsistent with an intention on the part
of the debtor to do so. There is nothing in any of the
letters indicating that the defendant did not intend
to pay the indebtedness which he admitted existed.
The difficulty which I encounter in holding the
defendant liable is whether his admission can be said
to apply to any one or all of the causes of action
alleged in the complaint. There were nine separate
loans made at different times, and each payable on
demand. Each constituted a separate and distinct
indebtedness.

Id. at 739 (emphasis added). Arista has provided no authority

for the proposition that separate audits segregate the debt

arising from a single contract into multiple and independent

obligations, but that is exactly what its argument presupposes.

Accordingly, the argument is rejected. Where the debt to be

acknowledged is due to the obligations of one single contract,

as it is here, a general acknowledgement of a debt will suffice.

See, e.g., United Rubber, Cork, Linoleum and Plastic Workers of

Am. v. Great Am. Indus., 479 F. Supp. 216, 230 (S.D.N.Y.

1979)("Nowhere does the statute require that the obligor recite

in the writing the precise amount of the debt. Rather, all that

is required is that the writing clearly acknowledges an existing

debt and that it contains nothing inconsistent with an intention

by the debtor to pay it.") (citing Lewis Morris, 387 N.Y.S.2d at

371).

2. The Question of Whether the 1997 Payment
   Extinguishes Debt Incurred Prior to That Date Is
   Irrelevant

Arista also argues that the purported acknowledgements make clear that it had no intention of paying any debts that Plaintiffs alleged were accrued prior to 1997 because of its belief that those debts had been extinguished by its 1997 Payment. (Def. Mem. at 19.)  This is in substance a liability argument, and it is not appropriate to resolve at this time. The sole issue at this stage is whether the statute of limitations has been reset pursuant to Section 17-101, which makes no provision for partially reviving a debt. See N.Y. Gen. Oblig. Law § 17-101.  Even assuming that the acknowledgements do indicate a belief that Arista had fully paid the Rollers for all royalties accrued prior to July 1, 1997, as Arista asserts (Def. Mem. at 20), that has no bearing upon any demonstration of an intention to pay the debt that remained and thus is irrelevant to the disposition of these cross motions.

3. Effectiveness of Each Communication

Plaintiffs assert that four communications meet the requirements of Section 17-101:  the 2001 Letter, the 2002 Letter, the Gawley Email, and the KPMG Memorandum.  The parties

agree that only one effective acknowledgement is necessary to restart the statute.

          a. **Gawley Email**

      The parties dispute whether the letter sent by Arista's representative, Steven Gawley, to Jane Preston, the filmmaker who was creating a documentary on the Bay City Rollers, qualifies as an acknowledgement sufficient to take Arista's debt out of the statute of limitations. Arista argues that because Preston is a third party and the communication from Delgado to her was not intended to influence Plaintiffs' conduct, it does not meet the requirements of Section 17-101. (Def. Mem. at 11.) Because the Gawley Email was not sent to Plaintiffs or someone acting on their behalf, but instead to a third party, New York law requires that it have been sent with the intent of influencing Plaintiffs' conduct. Lynford, 826 N.Y.S.2d at 377. To support their contention that the Gawley Email was intended to influence Plaintiffs' conduct, Plaintiffs produced a document purporting to be a transcript of the conversation among Gawley, Preston, and Delgado (the "Preston Transcript"). (See Donoghue Decl. Ex. B.) Arista refused to allow Plaintiffs to question Gawley at his deposition regarding the authenticity of the Preston Transcript upon a basis that Defendant now recognizes was inappropriate. (Tr. at 27:11-12 ("I was mistaken in raising a privacy objection.").) As a

result, Arista has waived any argument as to the authenticity of the Preston Transcript.

Arista maintains, however, that because the source recording for the Preston Transcript was made by Preston in violation of an agreement between Gawley and Preston, Plaintiffs should be prohibited as a policy matter from using the Preston Transcript.  (Def. 56.1 Resp. ¶ 61 ("Plaintiffs should not be permitted to rely upon a transcript of a purported conversation that Preston recorded in direct violation of the parties' express agreement."); Tr. at 30:9-13 ("I believe, your Honor, that if you have an agreement between two people not to do something and they do it anyway and you let it go ahead as if there never was an agreement, you are undermining, you are creating policy where people will do these things.").)  Arista's argument is unavailing.  If Plaintiffs were parties to the agreement not to record the conversation, Arista might have a remedy; however, Preston is not a Plaintiff, and Defendant acknowledged Preston was not an agent or employee of any Plaintiff.  (Def. 56.1 Stmt. ¶ 75.)  The Preston Transcript may therefore be considered on these cross motions.

Nevertheless, a question of fact exists as to whether Gawley, Arista's agent, intended to influence Plaintiffs' conduct by sending an email to Preston.  The Gawley Email itself reflects additional correspondence, which would be relevant in

determining Gawley's subjective intent in sending the email. (Topper Decl. Ex. 34 at ARB004247 ("Consider this our final written response.").) Gawley's intent in sending the email cannot be determined as a matter of law from the text of the Gawley Email, even when the email is read in conjunction with the Preston Transcript. Partial summary judgment for either party is thus inappropriate on the basis of the Gawley Email and the Preston Transcript.

### b. KPMG Memorandum

The parties also differ on the question of whether the KPMG Memorandum (Topper Decl. Ex. 58) is an acknowledgement of debt that satisfies Section 17-101. The question of whether the letter was "signed" need not be addressed; Plaintiffs have provided no evidence that the letter was ever delivered to Plaintiffs or anyone acting on their behalf. Neither party has produced a finalized version of the letter or any documentary evidence of its transmission, such as a cover letter or an accompanying email. Instead, the evidence indicates that neither party knows whether the KPMG Memorandum was finalized or sent. (See Topper Decl. Ex. 63 (McKeown Dep. Tr.) at 159:13-18 ("I don't have a specific recollection of receiving exhibit 62."); Topper Decl. Ex. 67 (Zizza Dep. Tr.) at 181:11-13 ("Q. Do you know whether the letter was ever sent? A. I do not know.").) Defendant disputes the admissibility of the KPMG

Memorandum, but it is admissible as precisely what it appears to be – a draft memorandum, for which there is no evidence that it was ever seen by anyone other than Arista or KPMG.

Because the KPMG Memorandum was not received by anyone other than Arista or KPMG, it cannot serve as an acknowledgement to satisfy Section 17-101.  Plaintiffs argue that under Section 17-101 "there is no requirement that the plaintiff be the recipient of an acknowledgement."  (Pl. Mem. at 12.)  This is true so far as it goes.  It does not go very far.  An acknowledgement that is intended to influence a creditor's conduct need not necessarily be delivered to the creditor, but Plaintiffs further argue that "[c]ourts consistently have held that internal records of a defendant are sufficient under Section 17-101."  (Id.)  That is not the case.  Plaintiffs' reading goes against both the text of the statute and the great weight of the caselaw.

"An acknowledgment or promise contained in a writing signed by the party to be charged thereby is the only competent evidence of a new or continuing contract . . . ."  N.Y. Gen. Oblig. Law § 17-101.  Section 17-101, of course, does not give rise to a classical "contract"; there need not be offer, acceptance, or consideration.  Nonetheless, the words "acknowledgement or promise" suggest the writing must have been communicated to someone with a connection to the obligee; it

would be a peculiar promise indeed that was known only to one of the parties. See Curtiss-Wright Corp., 97 N.Y.S.2d at 682-83 (Van Voorhis, J., concurring)(stating, in a case under New York's Civil Practice Act (precursor to the current Civil Procedure Law and Rules), that "[i]n order to extend the statute of limitations by an 'acknowledgment or promise contained in a writing signed by the party to be charged', pursuant to section 59 of the Civil Practice Act, such a paper must import a promise to pay. Such a promise is implicit in an 'acknowledgment' of the indebtedness. Merely carrying an account payable to plaintiff on defendant's books, [sic] would not constitute an acknowledgment or promise." (internal citations omitted)).

Accordingly, New York courts have long interpreted Section 17-101 and its precursors to require that the document at issue be received by the plaintiff or someone acting on his or her behalf, or that the document at the very least have been intended to influence the conduct of the plaintiff. See, e.g., Lynford, 826 N.Y.S.2d at 337 (documents were insufficient to take a debt out of the statute of limitations under Section 17-101 when the documents were "neither communicated to the plaintiff or to anyone on his behalf, nor intended to influence the plaintiff's conduct in any manner"); Skiadas v. Terovolas, 706 N.Y.S.2d 138, 138 (N.Y. App. Div. 2000)("The mere fact that the debt was carried on the defendants' books and tax returns

would not, in and of itself, constitute the required
acknowledgment [under Section 17-101]."); DeFreest v. Warner, 98
N.Y. 217 (1885)(holding, in a case decided under Code of Civil
Procedure § 414 (another precursor statute to N.Y. Gen. Oblig.
Law § 17-101), that written communication to a stranger may
serve to revive a debt if the communication was intended to
influence the conduct of the creditor).

　　　Even the cases cited by Plaintiffs generally do not
hold that a document that is known only to the party against
whom it is to be used qualifies as an "acknowledgement" within
the meaning of the statute.  Plaintiffs cite Daewoo Int'l (Am.)
Corp. Creditor Trust v. SSTS Am. Corp., No. 02 Civ. 9629, 2004
WL 830079 (S.D.N.Y. Apr. 13, 2004), as an example of a case in
which the court held that an internal financial statement was
sufficient to satisfy Section 17-101.  (Def. Mem. at 12.)  The
Daewoo court did consider the defendant's financial statements
to serve as an acknowledgement, but it is unclear to whom those
statements were communicated; and in any case, Daewoo did not
rest its holding upon the financial statements alone.  Instead,
the Daewoo court held that "[t]he applicable statute of
limitations was thus tolled by defendants' financial statements,
[a] letter [from defendant to plaintiff] and [a] partial payment
made by [defendant]."  Id. at *6 (emphasis added) (applying New
York law); see also Chase Manhattan Bank v. Polimeni, 685

N.Y.S.2d 226 (N.Y. App. Div. 1999) (debtor's personal financial statement, which carried the debtor's debt to the plaintiff, was sufficient to revive the debt when transmitted to the plaintiff).

In fact, of Plaintiffs' cited cases, only Clarkson Co. v. Shaheen relied solely upon a document that was not transmitted directly to the plaintiff, and even there, the document at issue, a financial report, was released outside of the company. 533 F. Supp. 905, 932 (S.D.N.Y. 1982) ("Here, [the defendant's] acknowledgment of its 'longstanding' obligation to SNR in its 1980 annual report . . . and the fact that the debt was carried on [the defendant's] books from at least 1978 through 1980 . . . is a clear recognition of the continuing validity of the obligation." (internal citation omitted)). Plaintiffs noted at oral argument that the defendant company in Clarkson was a private company and thus that its annual report was not available to the public at large (Tr. at 39:21-24) but made no argument that the shareholders of the defendant company owed it a fiduciary duty. Thus, even Clarkson apparently involved a document that was exposed to persons outside the obligor and its fiduciaries/agents, and as a result is substantively different from the situation presented by the KPMG Memorandum.

An internal document by definition cannot have been received by the plaintiff or someone acting on his behalf, and it would be nonsensical to suggest that such a document could be intended to influence the conduct of the plaintiff when said plaintiff could not know about it.  Moreover, even assuming that the holding of <u>Clarkson</u> can be reconciled with the weight of the caselaw, to extend that holding to include a draft letter that neither party asserts was ever seen by any person outside of Arista and its agents would be a bridge too far.  Documents that were not communicated other than between a corporate entity and its agents cannot meet the requirements of Section 17-101. Because Plaintiffs have adduced no evidence that the KPMG Letter was transmitted to anyone other than agents of Arista and KPMG, the KPMG Letter cannot serve as an acknowledgement within the meaning of Section 17-101.

### c. **Delgado Letters**

#### 1) The Delgado Letters Are Admissible

Arista urges that the Court find that the Delgado Letters are inadmissible settlement communications under Rule 408 of the Federal Rules of Evidence.  (<u>See</u> Def. Reply at 2-4.) Rule 408 generally prohibits the introduction of evidence regarding offers of compromise or settlement when the evidence is offered "to provide liability for, invalidity of, or amount of a claim that was disputed as to validity or amount."  Fed. R.

Evid. 408(a).  Evidence of an offer to compromise may be admissible under the Rule, however, if it is offered for another purpose.  See Fed R. Evid. 408(b).  "In applying the 'another purpose' exception to Rule 408, 'the trial judge should weigh the need for such evidence against the potentiality of discouraging future settlement negotiations.'"  Starter Corp. v. Converse, Inc., 170 F.3d 286, 293 (2d Cir. 1999).

Arista presents Trebor Sportswear Co. v. The Limited Stores, Inc., 865 F.2d 506 (2d Cir. 1989), as a prime example of Rule 408 acting as a bar to the use of settlement communications in a breach of contract action.  That case, however, is inapposite.  In Trebor, the question before the court was whether settlement communications could be used as evidence that the statute of frauds had been satisfied and thus that an enforceable contract existed.  865 F.2d at 510.  As the Court of Appeals noted in Trebor, "[f]or appellants, satisfying the statute of frauds was the necessary first step to proving, ultimately, the validity of their claims of breach of contract." Id.  Because the question of whether the statute of frauds is satisfied is by its nature inextricably intertwined with the question of whether a contract is enforceable (and thus with the question of liability), the Trebor court held that it was not an abuse of discretion to exclude evidence of settlement communications.

34

The Court of Appeals clarified the holding of Trebor in PRL USA Holdings, Inc. v. U.S. Polo Assoc., Inc., 520 F.3d 109, 115 (2d Cir. 2008). In PRL, a party sought to introduce evidence of settlement communications in order to prove a defense of estoppel by acquiescence. Id. at 112. The PRL court affirmed the district court's ruling that the evidence was admissible under Rule 408. Id. at 113-17. The PRL court distinguished Trebor by noting that the evidence in Trebor was "arguably permissible" for the purpose of proving compliance with the Statute of Frauds; the issue lay with the extremely close relationship between proving compliance with the Statute of Frauds and proving the existence of a contract, that is, the existence of any liability. Id. at 115. The PRL court further stated that "[its] conclusion in Trebor that the district court had discretion to exclude the evidence of compromise negotiations did not mean that the district court in Trebor was required to exclude that evidence." Id. at 116 (emphasis in original).

The dispute currently at issue is over whether the statute of limitations bars a claim of breach of a contract that both parties agree was validly formed. At this point, the parties are not litigating the validity of the underlying claims arising from the 1975 or 1981 Agreements, and though the parties have made it clear that they vigorously dispute the amount of

the claims at issue, that dispute is similarly not addressed on
this summary judgment motion, and the evidence is not offered
for that purpose.  See United States v. J.R. LaPointe & Sons,
Inc., 950 F. Supp. 21, 23-24 (D. Me. 1996) ("Rule 408 does not
exclude use of compromise evidence when it is offered to prove
something other than liability for, or invalidity of, a claim or
its amount.").  Instead, the question is whether Arista may
assert the statute of limitations as an affirmative defense.

Put another way, the evidence of these communications
is offered to determine whether Plaintiffs may even assert
claims stemming from obligations that existed prior to March 20,
2001, six years before this suit was filed, and not whether
those claims are valid.  Whether Arista is in fact liable for
the alleged breach of those obligations, and if so, the amount
for which it is liable, must be determined at a later date.

Finally, the public policy behind Rule 408, promoting
the compromise and settlement of disputes, does not outweigh the
need for this evidence.  See Starter, 170 F.3d at 293-94.  While
allowing settlement communications to prove the satisfaction of
Section 17-101 may well require an obligor to take extra care in
drafting any settlement communications to avoid triggering the
statute, a blanket immunity of settlement communications from
Section 17-101 would make far less sense.  Accordingly, the

Delgado Letters are admissible for the purpose of determining whether Arista satisfied the requirements of Section 17-101.

> 2)   The 2001 Letter and the 2002 Letter
>      Contain Conditional Acknowledgements of
>      Arista's Obligations

Both the 2001 Letter and the 2002 Letter contain conditional acknowledgements of Arista's debt.  The 2001 Letter states in relevant part "Arista would be willing to pay the Rollers all accrued royalties and the amount Arista conceded to in connection with the audit, provided Arista receives a correct change of address/payee letter signed by all of the parties in accordance with the terms of [sic] 1981 Agreement."  (Topper Decl. Ex. 26 at ARB003061.)  In other words, Arista acknowledged that it owed a debt and stated that it would pay subject to a defined condition.  Section 17-101 requires no more.

Arista has put forth a great deal of evidence tending to show that it believed "all accrued royalties" could refer only to those royalties that had accrued since 1997, when it issued a payment to the Rollers that it believed accounted for all royalties owed as of that time.  That fact, however, is not relevant here.  The obligor's state of mind is not a factor when the acknowledgement is communicated directly to the obligee. See, e.g., Lynford, 826 N.Y.S.2d at 337.  Moreover, Arista has not shown that Plaintiffs believed that the 1997 payment cleared

all Arista's debt, so that Arista cannot even argue that the
context of the 2001 Letter is such that "ordinary business
understanding and rules of common sense" require reading the
2001 Letter as referring only to post-1997 royalties.  See
Estate of Vengroski, 495 N.Y.S.2d at 201.  Because the 2001
Letter clearly and unequivocally acknowledges that Arista owes
the Rollers a debt, it may serve as an acknowledgement pursuant
to Section 17-101.

     The 2001 Letter does, however, condition the payment
of all accrued royalties upon Arista's receipt of "a correct
change of address/payee letter signed by all of the parties in
accordance with the terms of [sic] 1981 Agreement."  (Topper
Decl. Ex. 26 at ARB003061.)  The acknowledgement cannot restart
the statute of limitations unless that condition is met.  See,
e.g., Flynn, 572 N.Y.S.2d at 309.  Similarly, the 2002 Letter
also contains a statement that Arista is willing to pay the
Rollers "all accrued royalties" but again contains a condition
that Arista "receive correct payee information, in accordance
with the specific terms of the 1981 Agreements."  (Topper Decl.
Ex. 30.)  Plaintiffs bear the burden of demonstrating compliance
with the conditions stated by Arista.

     Plaintiffs take the position that they met those
conditions set forth in the Delgado Letters by sending a letter
after the filing of the lawsuit by sending a joint letter with

correct payee information. (Pl. Mem. at 18-19.)   They also take
the position that Arista should not be allowed to rely on
modification provisions of the 1981 Agreement, because Arista
was aware of the correct payee information and, e.g., was able
to make contact when it wanted to license the Rollers' music,
thus waiving any right to rely on the 1981 Agreement.   (Pl. Mem.
at 21-22.)   Arista argues that any condition must be met
directly and cannot be waived by the parties' knowledge or
actions.   It further says that because the statute of
limitations is measured from the time suit is filed, it would be
an illogical construction to allow a condition of the purported
acknowledgement to be met after the lawsuit is filed.

Plaintiffs provided no authority for their argument
that the conditions associated with an acknowledgement can be
waived.   (Tr. at 56.)   A condition can be waived in the realm of
contract law, but as Plaintiffs have correctly observed, Section
17-101 is not a matter of classical contract law.   (Tr. at 49;
Pl. Reply at 6 ("Section 17-101 is not a contractual question of
offer, acceptance or rejection.").)   As a result, Plaintiffs
have the burden of proving that any condition set forth in the
acknowledgement was entirely satisfied to trigger Section 17-
101.   See Flynn, 572 N.Y.S.2d at 309.

Any satisfaction of the condition after the suit was
filed, however, is effective.   Neither party provided (nor could

this Court locate) authority on the question of whether an
obligee may satisfy a conditional acknowledgment after suit has
been filed to collect the debt.  While it is more than a little
strange that Plaintiffs met the stated condition only after
filing this lawsuit, there is no apparent legal reason why the
satisfaction of the conditions in the letter after the suit was
filed should not make the acknowledgment effective.  Defendant's
argument that such a scheme would create "tremendous uncertainty
for courts and litigants" has no traction.  As a practical
matter, because the statute of limitations begins anew with an
acknowledgement, each potential acknowledgement carries with it
a six-year time limit on the satisfaction of any conditions, so
that any uncertainty would vanish six years after a purported
conditional acknowledgement.

> 3)  The Conditions in the 2002 Letter Were
>     Satisfied by Plaintiffs' 2007 Notice

The final question is whether Plaintiffs' 2007 Notice
satisfied the conditions set forth by the Delgado Letters.  Both
the 2001 Letter and the 2002 Letter required that the Rollers
receive correct payee information per the terms of the 1981
Agreement.  (Topper Decl. Exs. 26 at ARB003061 ("[P]rovided
Arista receives a correct change of address/payee letter signed
by all of the parties in accordance with the terms of [sic] 1981
Agreement."), 30 ("[P]rovided we receive correct payee

information, in accordance with the specific terms of the 1981 Agreements.").)  The 1981 Agreement required that any modification to its terms be "in writing, signed by each of the parties duly authorized to execute such modification."  (Topper Decl. Ex. 1 ¶ 7.)

Plaintiffs satisfied this condition.  The August 2007 Notice is a writing that provides correct payee information and includes signatures from each of the Rollers.  The corporate entities for each of the Rollers could not sign because those corporations had dissolved.  Under these circumstances where the various corporate entities relate to the various individual Plaintiffs, it stands to reason that the rights of those corporations to sign would also revert to the Rollers.

CONCLUSION[8]

Arista's motion for partial summary judgment [dkt. no. 125] is DENIED.  The Rollers' cross-motion for partial summary judgment [dkt. no. 130] is GRANTED.  The Rollers' motion to strike [dkt. no. 137] is GRANTED in part and DENIED in part.

---

[8] Some of the briefs and exhibits submitted by the parties in support of these motions were designated "Confidential."  The Court will file this Opinion under seal.  Counsel are directed to advise the Court by letter not later than April 7, 2011, whether the parties wish to preserve that sealed filing.  Any party that wishes to preserve the sealing must show good cause for the sealing.

The parties shall confer and inform the Court by letter no later than April 7, 2011, how they wish to proceed.

SO ORDERED.


Dated: New York, New York
       March 23, 2011

_Loretta A. Preska_
LORETTA A. PRESKA, CHIEF U.S.D.J.