USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/15/2014 _____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------x
ERIC FAULKNER, DUNCAN FAURE,        :        07 CIV. 2318 (LAP)
ALAN LONGMUIR, DEREK LONGMUIR,      :
LESLIE MCKEOWN AND STUART WOOD,     :        OPINION & ORDER
                                    :
               PLAINTIFFS,          :
                                    :
          -AGAINST-                 :
                                    :
ARISTA RECORDS LLC,                 :
                                    :
               DEFENDANT.           :
----------------------------------X

Loretta A. Preska, Chief United States District Judge:

          Plaintiffs Eric Faulkner, Duncan Faure, Alan Longmuir,

and Stuart Wood, former members of the Bay City Rollers,

(together "Plaintiffs" or "BCR") brought this action alleging

non-payment of tens of millions of dollars in unpaid royalties

from their record company, defendant Arista Records LLC

("Defendant" or "Arista") pursuant to a 1981 agreement.  The

Complaint alleged four separate counts of breach of contract,

breach of fiduciary duty, constructive trust, and an accounting.

See Complaint [dkt. no. 1].  Plaintiffs requested the ability to

produce experts to testify on the calculation of royalties due

to the complexity of royalty accounting in the music business.

[Dkt no. 176].  To help prove Plaintiffs allegations that

millions of dollars of royalties were owed to them and that

Arista's records could not be relied upon to calculate such

royalties, Plaintiffs propose the testimony of Wayne C. Coleman.

In support of its defense that Arista's records are usable, Defendant offers the rebuttal expert testimony of Tom Nilsen.

Currently before the Court are the parties' Daubert motions wherein Defendant seeks to exclude the testimony of Mr. Coleman [dkt. no. 189], a Certified Public Accountant and president of Financial Services Team, Inc. and The Royalty Compliance Organization ("RCO").  On September 12, 2013, Defendant filed under seal its Memorandum of Law in Support of Defendant's Motion to Exclude the Expert Report of Wayne C. Coleman ("Defendant's Brief" or "Def. Br.").  On October 11, 2013 Plaintiffs filed under seal their Memorandum of Law in Opposition to Defendant's Motion to Exclude the Expert Report of Wayne C. Coleman ("Plaintiffs' Opposition" or "Pl. Opp.").  On October 30, 2013, Defendant filed under seal its Reply Memorandum of Law in Support of Defendant's Motion to Exclude the Testimony of Wayne C. Coleman ("Defendant's Reply" or "Def. Reply.").

Plaintiffs seek to exclude the rebuttal testimony of Tom Nilsen, an accountant and partner in charge of the royalty examination group of Gelfand, Rennert & Feldman, LLP.  On September 12, 2013, Plaintiffs filed under seal their Memorandum of Law in Support of Plaintiffs' Motion to Exclude the Testimony of Tom Nilsen ("Plaintiffs' Brief" or "Pl. Br.").  On October

11, 2013, Defendant filed under seal its Memorandum of Law in Opposition to Plaintiffs' Motion to Exclude the Testimony of Tom Nilsen ("Defendant's Opposition" or "Def. Opp.").  On October 30, 2013, Plaintiffs filed under seal their Reply Memorandum of Law in Support of Plaintiffs' Motion to Exclude the Testimony of Tom Nilsen ("Plaintiffs' Reply" or "Pl. Reply.").

I.    BACKGROUND

    **A. The Reports**

        1. The Expert Report of Wayne Coleman[1]

Wayne Coleman is the founder and co-owner of Royalty Compliance Organization, a firm that provides auditing, royalty examination, valuation, expert witness, and other related services.  (Declaration of Wayne C. Coleman in Support of Plaintiffs' Opposition to Defendant's Motion to Exclude the Expert Testimony of Wayne Coleman ("Coleman Decl.") ¶ 1.  He has performed or supervised thousands of examinations and testified as an expert 36 times.  Coleman Decl. ¶¶ 4-7.  Mr. Coleman initially conducted a facial review of the royalty records to determine their consistency and attempted to test the royalty records against source information such as the domestic sales data from the company's accounting system and reports from foreign sales affiliates and licensees.  Coleman Rept. at 11-16;

---

[1] ("Coleman Rept.")

Transcript of the Deposition of Wayne C. Coleman ("Coleman Tr.")
at 66:23-67:13.  Mr. Coleman analyzed Arista's royalty records
for the purpose of determining their overall reliability.
Coleman Tr. at 68:14-69:10, 83:19-23, 98:24-99:4, 125:23-126:14;
Coleman Rept. at 4-11.

Upon a facial review of documents provided to Mr.
Coleman by Arista, Mr. Coleman concludes that Arista's records
are "abysmal" and failed the first test of overall reliability.
Coleman Rept. at 16, 86.  Mr. Coleman states that Arista's
records fail his facial review for consistency, particularly
because of an absence of royalty reports over extended periods
of time.  Id. at 4-5.  Despite a provision in certain agreements
that required Arista to provide semi-annual royalty accountings
to Plaintiffs, Arista failed to provide such accountings over
the course of several years.  Id. at 3.  The most extreme
example is an eleven year stretch between documents concerning
royalties due as of December 31, 1982 and documents concerning
royalties due as of December 31, 1994.  Id. at 4.  Mr. Coleman
indicated that the internal royalty recordkeeping of Arista does
not indicate that these documents were appropriately provided to
Plaintiffs.  Id. at 5.  This lack of royalty reporting does not
mean no documents were produced by Arista during these time
periods.  Mr. Coleman indicated that record producers received

4

reports during the time period and many internal reports show sales and other royalty figures.  Id. at 6.  In Mr. Coleman's professional opinion, these internal reports do not remedy the "information deficiency of the accounting record."  Id. at 7. Mr. Coleman opines that even where royalty reports were provided, the level of detail is "generally far below minimum industry standard for valid royalty statement or account."  Id. at 3.

Next, Mr. Coleman calls attention to unexplained errors in the documents which casts doubt on the reliability of Arista's accounting records.  Id. at 3-4.  Specifically, he identified the following inconsistencies and concerns:

- The existence of an account summary document that contained a balance forward of $1,016,281.78, which has been crossed out by hand and is not reflected in earlier or later reports.  Id. at 17.

- Summary reports for the same time period contained different ending balances.  Id. at 19.

- A balance forward adjustment, which decreased the amount owed to Plaintiffs, was not transparently explained or sufficiently supported.  Id. at 20.

- Arista's documents misapply price categories such as "budget," "full price," and "mid-price."  <u>Id.</u> at 22-24.

- Arista's documents inconsistently categorize income from synch licenses and are missing certain licensing income.  <u>Id.</u> at 24-34.

- There are various discrepancies regarding ancillary income, for example, that Arista's witnesses did not agree on what was included in the ancillary income category, which consists, on average of over half the total reported royalties from 1984-2010.  <u>Id.</u> at 34-38; 67-68.

- Mr. Coleman states that the pattern of reported royalties is not consistent with the over 600 re-releases of Plaintiff's music or with industry trends, such as the advent of compact discs.  <u>Id.</u> 44-50; 60-61.

- The high percentage of reported domestic digital sales indicates to Mr. Coleman that much higher foreign digital amounts should have been reported.  <u>Id.</u> at 53.

- The royalty documents from the 2000s applied incorrect royalty rates by deducting a 25% packaging charge for

CDs per the 1975 Agreement.  Mr. Coleman argues a 10%
deduction should have been applied because a CD is a
disc album and no CD amendment has been added. Id. at
56-59.

- Various documents indicate to Mr. Coleman that there
  were problems with delays in the processing of sales,
  various inconsistent peaks in sales and incomplete
  reporting and recognition of both foreign and domestic
  sales and earnings, and accounting discrepancies for
  compilations.  Id. at 64-69.

The second step of Mr. Coleman's verification analysis
was to compare the Arista records with the source information
upon which the records are based.  Mr. Coleman states that any
underlying sales documentation provided by Arista is "as (or
more) incomplete and unreliable than the various other
documents." Id. at 72; see also Pl.'s Opp. At 3.  Accordingly,
Mr. Coleman could not complete the second step in his analysis.
Based on his belief that Arista's records were wholly unreliable
and unable to be tested against the source documents, Mr.
Coleman proposes three alternative methodologies to construct
the amount of royalties owed Plaintiffs.  First, Mr. Coleman
proposes a minimum royalty amount owed based upon the available
records.  Though Mr. Coleman argues that the accounting records
maintained by Arista are incomplete and "entirely inadequate

with respect to industry-accepted standards," he finds that this calculation totals $8,141,213, a "substantial underrepresentation of the royalties properly due to the [Plaintiffs]."  Id. at 73-76.

As an alternative calculation, Mr. Coleman proposes a release-based method which uses identified releases to assess the number of sales.  Id. at 79.  In constructing this estimate Mr. Coleman supplemented the sales records received from Arista with his own analysis of sales numbers and retail prices.  He used sales awards for charted albums, the Bay City Rollers discography, public sources, and websites such as www.billboard.com, www.lescharts.com and various other websites. Id. at 80.  Mr. Coleman calculated the amounts due using $9.98 as the average album price and $1.00 as the average single price, prices determined by reviewing pricing data and from his own research.  He included a 10% packaging deduction, except for digital sales where he deducted nothing for packing.

Mr. Coleman applied a 12.2% royalty rate, which represented an average rate, to 90% of the estimated retail price as per the agreement.  Mr. Coleman added 48% for ancillary income from 1984 through 2012 based on Arista's data, 30% ancillary income from 1978 through 1983, and 10% ancillary income from 1975 through 1977.  Id. at 80-81.  Based on this

analysis, Mr. Coleman's release-based assessment indicates royalties due Plaintiffs of $11,425,473.  Mr. Coleman added interest, calculated at the statutory rate of 9%, of $29,510,419, for a total of $40,935,892, owed under his release-based calculation.  Mr. Coleman notes again that this calculation under-represents the royalties owed Plaintiffs.  Id. at 81-82.

Finally, Mr. Coleman proposes an interpolation assessment of royalties due Plaintiffs.  He argues that "[u]nless and until [Plaintiffs] are afforded an opportunity to assess the royalties actually owed using detailed sales and other royalty records- which is not possible using the current set of documents produced by Arista- some form of estimation will be necessary to reasonably assess the amounts of royalties due."  Id. at 85.  Because Mr. Coleman believes the release-based estimate is under-representative of actual earnings, he presented the interpolation method based on his "experience in the industry, [Plaintiffs'] success and popular profile, the history of the music industry, and expected sales pattern over time of a band such as [Plaintiffs']."  Id. 85-86.  Mr. Coleman used assessments based upon certifications and documented releases for 1975-1977 as the "left" endpoint for the interpolation.  He used the "reported royalties of the Sony

documents as adjusted for expected audit amounts and identified royalty rate errors as the 'right' endpoints." Id. at 86-93. He then determined an "exponential decay function," which shows an initial sharp decrease tapering off in time, using "standard curve-fitting techniques." Id. 93-94.  Mr. Coleman notes that he based the sales estimate for the period of 1975-1977 on certifications, chart rankings, and other public information because such information was abundant for the time period and thus reasonably could be used for the assessment.  Id. at 94.

Mr. Coleman assumed that the royalties reportable on sales from 1975 through 1978 are reportable 50% in the year of release, 40% in the second year after release, and 10% in the third year.  Id.  He found not only that Arista's records for the period between 1977 and 2004 to be "wholly inadequate" regarding verifiable releases, sales, and royalties, but that the public record of this information was "notably deficient" as well.  His conclusions are based upon the fact that he cannot find overseas sales data from public sources and does not believe Arista's records to be reliable in that respect.  Id. at 95.  After 2004, when Sony took over Arista and its record management, the records "offer some objective standard for measuring royalties due for those periods." Id.  Mr. Coleman, therefore, used these figures, corrected for errors he

10

identified,[2] as the baseline amount for the time period post-2004.  Id.   Based on the certifications and chart rankings in the mid-1970s, Mr. Coleman determined that the royalties owed from 1979 through 2012 amount to $32.8 million and $112.7 million with the interest rate applied.  Id. at 98.

Mr. Coleman expects to testify that Arista did not comply with its contractual obligation to provide regular royalty statements and render payments for accrued royalties. Additionally, he plans to testify that Arista's produced documents are inherently unreliable and cannot be used in determining the actual royalty income due Plaintiffs.  Mr. Coleman plans to explain his three methods for calculation of royalties and present his calculations of royalties owed to the jury.  Id. at 100.

2. The Rebuttal Report of Expert Tom Nilsen[3]

Mr. Nilsen has been in the music industry for more than 30 years and he has worked on behalf of both artists and record companies.  Nilsen Rept. 1-2, Nilsen Rept., Ex. 1.  He

---

[2] Such corrections include adjusting the Sony royalties for a 1976 un-resolved audit that "would have at least settled for 50% of the claims," reducing the packaging percentage to 10% because there was no CD amendment added (required for Sony to take 25%), an adjustment in digital sales, which according to Mr. Coleman's research are considered licensing and thus should have been paid at 50%, rather than at the physical sales royalty rates, and adding back in a deducted recording fee of $103,000, which was inappropriate because Plaintiffs are not recording new music and with interest amounts to $163,255.
[3] ("Nilsen Rept.")

has worked for two major record companies, including as a
manager in the domestic royalty accounting department of CBS
Records and as a senior vice president of business affairs
administration at PolyGram Records, Inc.  <u>Id.</u> at 1-2.  He has
worked at Gelfand, Rennert & Feldman LLP for the last 12 years
representing artists, publishers, and other royaltors in royalty
examinations.  <u>Id.</u>  He has conducted or overseen hundreds of
royalty examinations on behalf of a variety of parties, artists,
and record companies alike.  <u>Id.</u> at 1.

Mr. Nilsen's expert report addresses the main opinions
offered in Mr. Coleman's report: (1) That Arista's records are
"abysmal" and "useless"; (2) that the "minimum royalty amount
owed" to Plaintiffs is $2.9 million ($8.1 million with
interest); (3) that available sales and royalties data should be
ignored when determining whether additional royalties are owed
to Plaintiffs, and, instead, a release-based estimate produces a
reasonable estimate of royalties due to Plaintiffs ($11.4
million and $40.9 million with interest); and (4) the
interpolation method represents an even more accurate estimate
($32.8 million and $112.7 million with interest).

Regarding Mr. Coleman's opinion that Arista's records
are "abysmal" and "useless" Mr. Nilsen opines:  "Collectively,
the voluminous royalties and sales data I reviewed provide

support for [Plaintiffs'] earnings as reported by Arista.  In my review of available documentation, I have found the sales information printed over the decades to be internally consistent, and consistent with the royalties reported." Id. at 22.  In coming to that opinion, Mr. Nilsen undertook an analysis of available royalty statements to determine whether a statement history could be constructed using documents produced by the parties in this litigation.  Id. at 5.  In doing this Mr. Nilsen, was able to "recreate a comprehensive and detailed statement summary of accountings and payments from Arista to the Bay City Rollers and their representatives for the 38 year period spanning July 1, 1974 to June 30, 2012." Id. 5-10.  This statement history was attached to his report as Exhibit 3.

Mr. Nilsen's analysis allowed him to confirm that Arista has accounted for nearly $5.5 million in BCR royalties earnings since the mid-1970s (consisting of $4.4 million that Arista paid BCR or their representatives from the mid-1970s) through 1997 and almost $1 million in royalties from 1997 to the present that Arista is holding.  Id. at 9.  Mr. Nilsen further explains that this analysis shows that with the exception of an 18-month period between July 1, 1980 and December 31, 1981, statements provided by Arista contain a sufficient level of detail to show earnings and deductions for Plaintiffs from July

1, 1974 through June 30, 2012.  Id. at 10-11.  For the missing
18-month period, Mr. Nilsen analyzed the governing agreements,
historical sales data, and available artist and producer
statements, and determined that the opening balance on the
royalty statement for the next available period is accurate.
Id. at 11-13.

Next, Mr. Nilsen examined available historical
documentation, including public information about Plaintiffs, to
determine whether this information supported or refuted his
analysis, contradicting Mr. Coleman's claim that there is no
detailed information regarding the sales of Plaintiffs' music.
Id. 13-15.  Mr. Nilsen found that, for example, "Ancillary
Income" reported on BCR royalty statements from 1983 through
2003 reflects royalties from foreign and club sales and this
documentation provides detailed sales information for BCR
products in over 50 countries over this 20-year period.  Id. at
14-18.  Mr. Nilsen's review of public information about BCR also
lends support to his view that the career arc of BCR explains
why there was a substantial decline in royalties in the 1980s,
not because Arista's records are insufficient.  Nilsen Rept. 24-
29.  In performing this analysis, Mr. Nilsen determined that the
available materials show that Arista tracked and accrued
royalties even for periods where a royalty statement may not

14

have been rendered.  Because Arista tracked this information, it can be used to evaluate royalties owed even for periods when statements or payments were not issued.  Id. at 13.

After establishing this baseline, Mr. Nilsen conducted point-by-point analyses of Mr. Coleman's opinion that Arista's records must be ignored.  In his view none of those grounds seriously calls into question Arista's record-keeping.  Id. at 56-57.  Mr. Nilsen analyzed available data to address Mr. Coleman's claims that Arista's records are inadequate because they do not reflect trends he would expect to see.  Id. at 29-42.  For example, Mr. Nilsen's analysis indicated that over $700,000 of the $1.3 million in royalties earned by BCR between July 1, 1983 and December 31, 2010 relates to the sale of foreign releases, directly addressing concerns about the records raised by Mr. Coleman.  See Coleman Rept. at 43; Nilsen Rept. at 31.  Mr. Nilsen explained the royalty increases from 2003 and 2004 with information that one-time occurrences such as license fees for the use of BCR recordings in a film and advertising campaign and the release of a BCR greatest hits album in foreign markets were responsible for such increases.  Nilsen Rept. at 35-37.  Mr. Nilsen opines that many of the items Mr. Coleman cites in his position that Arista's records are unreliable are issues that routinely arise in audits of all major labels and

should not be grounds for ignoring available historical records. Nilsen Rept. at 56-76.

Mr. Nilsen addressed Mr. Coleman's minimum royalty amounts owed measure of royalties by reviewing in detail Mr. Coleman's opinion and the bases for that opinion.  He analyzed the data, documentation, and governing agreements.  Nilsen Rept. at 18, 76-82.  Mr. Nilsen noted that more than 70% of Mr. Coleman's figure for this award is based upon assumptions about audit claims made during the mid-1970s, without analysis to support the two claimed audit amounts.  Mr. Nilsen noted that in an audit the record company is not tasked with presenting a supported settlement, an artist is tasked with presenting a supported claim, something not done by Mr. Coleman on behalf of Plaintiffs.  Further he corrected Mr. Coleman's calculation of the amount of royalties Arista has on hold, adding $18,000, indicated that Mr. Coleman has not explained his claim for significant upward adjustments of royalty rates for CD and Digital sales under the governing agreements, addressed amounts of recording costs and a $10,000 credit to BCR in royalties, and finally, deducted approximately $28,000 in royalties from 2003 that Mr. Nilsen determined reflected a double-payment.  Id. at 18, 80-82.

Regarding the release-based method and the interpolation method, Mr. Nilsen has two threshold opinions: (1) the methods ignore almost all available historical documentation and data concerning Plaintiffs' royalties (Id. at 83-85); (2) the approaches are founded on assumptions that he views to be baseless and are riddled with errors and therefore would not be accepted in the music industry (Id. at 85-103, 104-19).

With respect to the release-based estimate, Mr. Nilsen analyzed Mr. Coleman's assumptions about key items such as retail price, royalty rate, and unit sales in view of the relevant agreements, available historical data, and publically available information and opined that such a methodology could not produce a reasonable estimate of royalties.  For example:

- For 75% of the sales claimed by Mr. Coleman, Mr. Nilsen states that the release-based estimate assumes a price that is 25% to 42% higher than the price at which those products sold.  Id. at 87-88.

- Mr. Coleman's assumed uniform 12.2% royalty rate is in contrast with the governing agreement, which sets different rates for different recordings and applies lower royalty rates for foreign sales.  Id. at 80-90.

- Mr. Nilsen identifies certain products assumed by Mr. Coleman to include royalty-bearing sound recordings and

17

products unquestionably not covered by Plaintiffs' agreements with Arista.  <u>Id.</u> at 96, Ex. 7.

- Mr. Nilsen opines that Mr. Coleman's assumption that each compilation contained ten tracks, one being a BCR track, is significantly inflated.  <u>Id.</u> at 99-100, Ex. 8.

Concerning the interpolation method, Mr. Nilsen presents numerous reasons why music sales do not follow the patterns captured in the interpolation's mathematical formula.  <u>Id.</u> at 104-10.

## II.  <u>DISCUSSION</u>

### A. Legal Standard

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
>
> Fed. R. Evid. 702.

In order for the expert opinion to be admissible, the witness "must be qualified as an expert, the testimony must be

18

reliable, and the testimony must assist the trier of fact." <u>In</u>
<u>re Fosamax Prods. Liab. Litig.</u>, 645 F. Supp. 2d 164, 172
(S.D.N.Y. 2009).

"Courts within the Second Circuit have liberally
construed expert qualification requirements." <u>In re Methyl</u>
<u>Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.</u>, MDL No. 1358
(SAS), 2008 WL 1971538, at *5 (S.D.N.Y. May 7, 2008) (internal
quotation marks omitted). "A witness's qualifications 'can only
be determined by comparing the area in which the witness has
superior knowledge, skill, experience, or education with the
subject matter of the witness's testimony.'" <u>In re Fosamax</u>, 645
F. Supp. 2d at 172 (quoting <u>Carroll v. Otis Elevator Co.</u>, 896
F.2d 210, 212 (7th Cir. 1990)).

The Advisory Committee's note to Rule 702 explains
that the Rule was amended to include the three reliability-based
requirements in response to <u>Daubert v. Merrell Dow</u>
<u>Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993) and its progeny,
<u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137 (1999), and <u>General</u>
<u>Elec. Co. v. Joiner</u>, 522 U.S. 136, 146 (1997). <u>See</u> Fed. R. Evid.
702 advisory committee's note. In <u>Daubert</u>, the Supreme Court
interpreted Rule 702 to require district courts to act as
gatekeepers by ensuring that expert scientific testimony "both
rests on a reliable foundation and is relevant to the task at

hand." 509 U.S. at 597. This requires "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Id. at 592-93; see also Kumho Tire, 526 U.S. 137 (holding gate keeping function applies to all expert testimony, whether based on scientific, technical or other specialized knowledge).

To be scientifically valid, the subject of expert testimony must rest on "good grounds, based on what is known." Daubert, 509 U.S. at 590 (internal quotation marks omitted). In Daubert, the Court set forth a non-exclusive list of factors that district courts might consider in gauging the reliability of scientific testimony. Id. at 593-95. These factors include: (1) whether the theory has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error and whether standards and controls exist and have been maintained with respect to the technique; and (4) the general acceptance of the methodology in the scientific community. Id. "Whether some or all of these factors apply in a particular case depends on the facts, the expert's particular expertise, and the subject of his testimony." In re Fosamax, 645 F. Supp. 2d at 173 (citing Kumho Tire, 526 U.S. at 138). A district court has broad discretion both in determining

20

the relevant factors to be employed in assessing reliability and in determining whether that testimony is in fact reliable. Kumho Tire, 526 U.S. at 153; Zuchowicz v. United States, 140 F.3d 381, 386 (2d Cir. 1998).

Weighing whether the expert testimony assists the trier of fact goes primarily to relevance. Daubert, 509 U.S. at 591. Relevance can be expressed as a question of "fit"—"whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." Id. (citing United States v. Downing, 753 F.2d 1224, 1242 (3d Cir. 1985)). In addition, expert testimony is not helpful if it simply addresses "'lay matters which a jury is capable of understanding and deciding without the expert's help.'" United States v. Mulder, 273 F.3d 91, 101 (2d Cir. 2001) (quoting United States v. Castillo, 924 F.2d 1227, 1232 (2d Cir. 1991)). Finally, the testimony is not helpful if it "usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." United States v. Duncan, 42 F.3d 97, 101 (2d Cir. 1994) (quoting United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991)).

"In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method

by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002). However, in accordance with the liberal admissibility standards of the Federal Rules of Evidence, only serious flaws in reasoning or methodology will warrant exclusion. Id. "As long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversary process--competing expert testimony and active cross-examination--rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co., 161 F.3d 77, 85 (1st Cir. 1998) (quoting Daubert, 509 U.S. at 596); see also Amorgianos, 303 F.3d at 267. If an expert's testimony lies within "the range where experts might reasonably differ," the jury, and not the trial court, should "decide among the conflicting views of different experts." Kumho Tire, 526 U.S. at 153.

"The Daubert analysis focuses on the principles and methodology underlying an expert's testimony, not on the expert's conclusions. In re Fosamax, 645 F. Supp. 2d at 173-74 (citing Daubert, 509 U.S. at 595). However, the Supreme Court in Joiner recognized that "conclusions and methodology are not entirely distinct from one another." 522 U.S. at 146.

Therefore, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Id. (stating that "nothing in either Daubert or the Federal Rules of Evidence requir[es] the admission of opinion evidence connected to existing data only by the ipse dixit of the expert.")  The ultimate object of the court's gate-keeping role under Rule 702 is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire, 526 U.S. at 152.  "The flexible Daubert inquiry gives the district court the discretion needed to ensure that the courtroom door remains closed to junk science while admitting reliable expert testimony that will assist the trier of fact." Amorgianos, 303 F.3d at 267. Finally, like all evidence, expert testimony may be excluded under Rule 403 if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.

**B. Analysis**

To support their argument that Arista's records are not suitable for use in determining royalties owed Plaintiffs and therefore alternative proposed methods of calculation should be used, Plaintiffs have put forth a music industry expert to opine that after reviewing the records, the facts conclusively prove that proposition. To support their argument that Mr. Coleman's analysis is flawed and Arista's records are appropriate for use, Arista has put forth a music industry expert to contradict Mr. Coleman's findings. As will be discussed below, the Court finds that Mr. Coleman is qualified to testify about his opinions on the status of Arista's records, the minimum royalties owed damages estimate, and the release-based damages estimate. Nevertheless, the Court finds that Mr. Coleman did not utilize reliable methods in arriving at his conclusions regarding Arista's records and the release based damages estimate. The Court also finds that Mr. Coleman is not qualified to testify on the interpolation method of calculating royalties. The Court finds that Mr. Nilsen is qualified to give rebuttal testimony regarding the minimum damages owed estimate. Accordingly, Arista's motion to exclude the testimony of Mr. Coleman is granted in part and denied in part. The Court will not decide the portions of Plaintiffs' motion to exclude the

24

testimony of Mr. Nilsen regarding Arista's records, the release-based estimate, and the interpolation estimate, but the motion is denied as it pertains to the minimum royalties owed estimate.

1. <u>Supplemental Declarations</u>

As an initial matter, the Court must address the supplemental declarations filed by Plaintiffs after expert discovery had concluded.  Plaintiffs submitted two different declarations, the Declaration of Wayne C. Coleman ("Coleman Decl.")  and the declaration of Darla Crain ("Crain Decl.") in support of Plaintiffs' Opposition.  These declarations are in conflict with this Court's February 22, 2013 Order [dkt. no. 178] denying Plaintiffs' request to provide the testimony of two experts.  This Court ordered that Plaintiffs may provide one expert only to testify on the matter of royalties owed.  After multiple letters submitted on the topic, the Court stated "[t]here is no reason set out why the parties should incur the additional expense of two experts for the purpose of estimating royalties. . . .Plaintiffs may proceed with one expert." [Dkt. no. 178].  Although expert discovery in this case closed June 10, 2013, with the completion of expert depositions, Plaintiffs proffered two declarations containing new opinions to support their expert testimony four months later.  [dkt. no. 177].

In their declarations, Mr. Coleman and Ms. Crain attempt to explain some of the issues Mr. Nilsen addressed in his rebuttal report.  Mr. Coleman and Ms. Crain explain the methodology of the interpolation and release-based methods of royalty calculation.  Coleman Decl. ¶ 14-35; Crain Decl. 5-17. Ms. Crain describes the application of the interpolation method in detail, explaining the curve-fitting technique known as an exponential decay curve.  Crain Decl. ¶¶ 9-12.  Additionally, Mr. Coleman provides additional information that supports his opinion that Arista's records are "abysmal".  He notes that he subsequently reviewed the documents Arista highlighted in their moving papers as having been produced but simply ignored, such as "royalty statement backup, foreign sales information, reporting from foreign territories, and producer statements" (Def. Motion at 7) and determined that they are not "source" documents and therefore cannot be used to verify Arista's historical records.  Coleman Decl. ¶ 43.

Under Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure expert testimony must be accompanied by a written report which shall contain, inter alia, "a complete statement of all opinions the witness will express and the basis and reasons for them," "the data or other information considered by the witness in forming them," and "any exhibits that will be used to

summarize or support them."  Parties are required to make these disclosures "at the times and in the sequence that the court orders." Fed.R.Civ.P. 26(a)(2)(C).  Rule 26(e) provides that "[a] party who has made a disclosure under Rule 26(a) . . . must supplement or correct its disclosure . . . if the party learns that in some material respect the disclosure . . . is incomplete or incorrect."  Rule 37(c)(1) states that if a party fails to abide by these requirements, "the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." The Second Circuit has interpreted the language in Rule 37(c)(1) to allow for preclusion of the supplemental expert declarations where there is "no substantial justification and the failure to disclose is not harmless." Design Strategy, Inc. v. Davis, 469 F.3d 284, 294 (2d Cir. 2006).

Nevertheless, "experts are not free to continually bolster, strengthen, or improve their reports by endlessly researching the issues they already opined upon, or to continually supplement their opinions." Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co., Ltd., 769 F. Supp. 2d 269, 278 (S.D.N.Y. 2011) (internal citations and quotations omitted). Under Rule 26, an expert's report that does not rely on "any

information that was previously unknown or unavailable to him," should not be considered a supplemental report. Id. Because preclusion of an expert may be a harsh sanction, the courts must consider four factors in assessing whether preclusion is appropriate: (1) the explanation for the delay in providing the evidence; (2) the importance of the new evidence; (3) the potential prejudice to the opposing party; and (4) whether a continuance is more appropriate. See id.; Point Prods. A.G. v. Sony Music Entm't, Inc., 93 CIV. 4001 (NRB), 2004 WL 345551, *9 (S.D.N.Y. Feb. 23, 2004).

Finally, under Rule 26, supplemental expert evidence offered after the close of discovery should not be admitted where it "expound[s] a wholly new and complex approach designed to fill a significant and logical gap in the first report," because doing so "would eviscerate the purpose of the expert disclosure rules." Id. Nevertheless, "to the extent that an expert affidavit is within the scope of the initial expert report, it is properly submitted in conjunction with dispositive motions even outside the time frame for expert discovery." Cedar Petrochemicals, 769 F. Supp. 2d at 279.

Mr. Coleman's declaration provides additional information on a variety of issues raised in his expert report and Defendant's Motion. He provides details on his own

28

qualifications (Coleman Decl. ¶¶ 3-7), Arista's audits (¶¶ 8-13), the interpolation and release-based methods of calculating royalties (¶¶ 14-32), the development of his 12.2% average royalty rate (¶¶ 33-35), his observations on the weaker than expected foreign sales during the 1980s (¶¶ 36-38), Mr. Nilsen's review of Plaintiffs' product list (¶¶ 39-40), the 20% bump in royalties (¶¶ 41-42), and the voluminous documents produced by Arista and referenced in Declaration of Gary Wade Leak in Support of Arista Records LLC's Motion to Exclude Expert Testimony ("Leak Decl.") (¶ 43).  All of these topics were covered in varying levels of detail in Mr. Coleman's initial expert report.  It cannot be said that this evidence represents "a wholly new and complex approach" to his first report, he has been deposed on these topics so the risk of prejudice is low, and the additional evidence would be useful to the trier of fact and this Court.  Accordingly, this Court will not strike Mr. Coleman's declaration.

Ms. Crain's declaration consists primarily of expert opinions about the development and accuracy of the interpolation model.  Crain Decl. ¶¶ 5-14.  Ms. Crain helped put together the formula for the interpolation model using an exponential decay curve, apparently a methodology used in most of Ms. Crain and Mr. Coleman's analyses for valuation or audits.  Id. ¶¶ 9.  Ms.

Crain explains that this formula is common among scientists and mathematicians.  Id. ¶ 10.  Ms. Crain provides explanations for the choice of endpoints, how best to construct a "smooth, reliable curve," and her opinion that the model accurately represents the estimated royalties owed Plaintiffs.  Id. ¶¶ 11-13.  These opinions are offered to supplement Mr. Coleman's incomplete knowledge of the interpolation model of royalties that he recommends in his expert opinion.  As explained more fully below, Mr. Coleman relied on Ms. Crain and her team to determine the methodology used as she is an expert in math and computer science.  Coleman Tr. at 42:17-21.

First, the parties have had sufficient time to conduct expert discovery, and Plaintiffs offer no explanation for the delay in providing the evidence offered by Ms. Crain. Additionally, the parties requested and were granted a brief extension of ten days to complete their expert discovery.  [Dkt. no 183].  Plaintiffs did not submit additional requests for extensions in discovery.  Subsequently submitting new expert opinions after the close of discovery violates the Federal Rules of Civil Procedure.  Rather than refute this principle, Plaintiffs state that the supplemental declarations "focus upon issues raised for the first time in Mr. Nilsen's rebuttal report and/or [Defendant's Motion]."  Pl.s' Opp at 2 n.2.

Second, the information offered in Ms. Crain's
declaration is important to Mr. Coleman's testimony regarding
the interpolation method of calculating royalties.
Nevertheless, the importance of the evidence must be balanced
against the third factor, the prejudice to Defendant as a result
of the admission of the new evidence.  Ms. Crain's opinions
about the interpolation methodology in her declaration
constitute expert opinion on the subject.  The portions of the
Crain Declaration relating to the interpolation model are based
upon Ms. Crain's specialized knowledge of the interpolation
method itself, the specific interpolation her team constructed,
and the formula that they used.   This cannot be categorized as
the personal knowledge of a lay witness.

The introduction of additional expert testimony, after
the close of expert discovery would unduly prejudice Defendants
who have not been awarded the opportunity to prepare a rebuttal
report or depose Ms. Crain regarding her opinions.  The
additional expert report is also prejudicial because of the
additional expense imposed on Defendant relating to a response.
Plaintiffs had the opportunity to follow proper procedures and
choose Ms. Crain as their expert, as it appears she would have
qualified, but Plaintiffs chose Mr. Coleman instead.  Because
the Court clearly stated that Plaintiffs would be allowed the

testimony of one expert, Plaintiffs may not circumvent that order now by offering a supplemental declaration of what amounts to expert opinion on the subject of interpolation following the close of expert discovery.

The Court also strikes the portion of the Crain Declaration addressing Arista's criticisms as it constitutes expert opinions on the subjects of the year after year percentage decrease and Microsoft's relationship with the formulas employed. Crain Decl. ¶¶ 15-17. Plaintiffs' explanation that the declaration is simply a response to issues raised in Defendant's motion and Mr. Nilsen's rebuttal does not change the fact that the declaration puts forth opinions by an unoffered expert submitted after the close of expert discovery. Allowing such opinion would be prejudicial to Defendants who must address these opinions when a second expert was expressly forbidden by this Court.

2. Mr. Coleman's Testimony

This Court concludes that Mr. Coleman is qualified to testify about the status of Arista's records, the minimum royalties owed estimate, and the release-based royalties estimate based on a comparison of the area in which he has "superior knowledge, skill, experience, or education" with the subject matter of his proposed testimony. See In re Fosamax,

645 F.Supp. 2d at 172 (internal quotations and citations omitted).  Mr. Coleman has performed royalty examinations in the music industry for forty years.  Coleman Rept. at 1-2; Coleman Decl. ¶ 4.  Mr. Coleman has conducted or supervised thousands of royalty examinations and testified in court 36 times without being excluded.  Coleman Decl. at ¶¶ 4-7.  The subject matter of Mr. Coleman's proposed testimony is the amount of royalties owed Plaintiffs.  His area of expertise and his lengthy career in the royalties examination industry indicate that he is qualified to testify on the subject of the royalties owed Plaintiffs.

   a. Arista's Records

        Mr. Coleman's first step in his methodology was to analyze the accuracy and completeness of Arista's royalty records to determine if they could be used to calculate the royalties owed.  Arista does not dispute that this step was necessary but instead argues that Mr. Coleman's opinions about Defendant's records and his damages estimates are not reliable and therefore may not be presented to the trier of fact.  Def. Br. at 11-20.  The first opinion Mr. Coleman wishes to offer is that Arista's documents are "abysmal", "gap-ridden", "meaningless", and "woefully incomplete and wholly unreliable" for use in reconstructing actual sales and actual royalty income due.  Arista's primary argument that this opinion should be

excluded is that Mr. Coleman did not review all of the relevant records and therefore his opinion is not grounded in sufficient facts and data and lacks sufficient indicia of reliability. Def. Br. at 11-12.

Courts in this district have found that an expert report lacked reliability where the expert did not review data he believed to be unavailable, when the data was, in fact, produced. See Lippe v. Bairnco Corp., 288 B.R. 678, 694 (S.D.N.Y. 2003) aff'd, 99 F. App'x 274 (2d Cir. 2004); see also Celebrity Cruises Inc. v. Essef Corp., 434 F. Supp. 2d 169, 182 (S.D.N.Y. 2006) (excluding damages expert who was not aware of availability of "actual performance data" because she "declined to incorporate their actual growth rates into her methodology" once she became aware of data). Mr. Coleman produced a 51-page list of documents he considered in his review of Arista's records. Coleman Rept. at Ex. F. In his report, Mr. Coleman opined that among other things, no foreign royalty data exists (Coleman Rept. at 40), the documentation regarding ancillary income is unusable (Id. at 9), and the producer royalty statements and documents that may provide support for assessing royalties owed an artist, were "gap-ridden" and therefore not analyzed (Id. at 76).

Arista argues that the documents Mr. Coleman required to verify the Arista royalty database such as "royalty statement backup, foreign sales information [and] reporting from foreign territories" were produced, were available, and that Mr. Coleman simply did not review them.  Def. Br. at 12.  Indeed, documents such as a 150,000-line spreadsheet with data reported by foreign territories, were rejected out of hand (Coleman Rept. at 72-73; Leak Decl. Ex. J; Pl. Opp. at 7), and voluminous historical royalty and sales information was not reviewed.  Coleman Tr. at 136:18-144:21; compare Leak Decl. Ex. C, E, G, H, K, M with Coleman Report Ex. F.  As an explanation for his not considering these documents highlighted in the Leak Declaration, Mr. Coleman stated in his belated declaration that those reports all came from the same royalties database and could not be counted on as source documents to verify the accuracy and completeness of the records:

> "None of those documents are the type an auditor would rely on to verify the accuracy and completeness of documents.  For example, there are no titles, dates, nor a description of the system where this data came from.  It is not labeled to know if this data is a subset of other data, complete periods, system it comes from, etc."

Coleman Decl.  ¶ 43.

The reliability of this immediate rejection is called into question by the fact that most of the documents have titles

(Leak Decl. Exs. A-D, F-H, J-M), all have dates, and at least two categories reflect the system from which they were developed (Leak Decl. ex. H, J).

The reliability of Mr. Coleman's analysis is further called into question by the fact that Mr. Coleman disclosed at his deposition that he had failed to review all of the documents produced by Arista in the course of preparing his expert report. Mr. Coleman explained that he had not reviewed the documents initially because of "lawyer error" and testified that his subsequent review did not change his opinion of the state of Arista's records.  Coleman Tr. at 86:10-12.  He also admitted that he had relied on Plaintiffs' counsel to choose the specific documents from Arista's production for his review.  Def. Motion at 4; Coleman Tr. at 86:10-12.  Mr. Coleman assumed he had been given the entire production and did not know what percentage of the entire production of Arista's records he had actually reviewed in preparing his report.  Coleman Tr. at 86:10-12.

Mr. Coleman's testimony that his subsequent review of the documents highlighted by Defendants did not change his opinion does not cure the deficiencies in his methodology.  By not confirming that the records he reviewed were representative of Arista's production, Mr. Coleman's opinion that the records were "abysmal", among other things, is based on insufficient

facts and data.  See E.O.C. v. Bloomberg L.P., Civ. No. 07-
8383 (LAP), 2010 WL 3466370, at *14 (S.D.N.Y. Aug. 31, 2010)
(exclusion of an expert is required where the expert makes "no
effort to ensure that the materials he reviewed were
representative").

Finally, this Court finds Arista's argument that Mr.
Coleman's opinions about Arista's records were set prior to his
review of the documents to be persuasive.  Def. Reply at 2.
Any background information that Mr. Coleman required to compare
the records to "source" documents could have been specifically
requested at the outset of expert discovery.  Mr. Coleman's
refusal to ask for such evidence, his failure initially to
review of many categories of records, and his disregard of such
relevant records after his belated review indicate that his
methodology was aimed at achieving one result.  Such analysis is
unreliable, and therefore Mr. Coleman's opinion about Arista's
records must be excluded.  See E.O.C., 2010 WL 3466370, at *17
("[t]o ignore contradictory testimony in order to arrive at a
desired conclusion highlights the unreliability of [an expert's]
methodology.")

b. Royalties Estimates

Next, Mr. Coleman seeks to opine on three alternative
damages estimates.  The first estimate, referred to as the

minimum royalties owed estimate, is based upon Arista's records.
The estimate aggregates the sum of audit claims for the period
of 1975-1976, amounts conceded by Arista from July 1997 through
2003, January 2004 through December 2004, and 2005 through
present, amounts corrected for incorrect CD packaging and
digital licensing royalty rates, and disallowed recording costs.
Coleman Rept. at 74-75.  Mr. Coleman estimates these amounts as
totaling $8,141,213, with additional statutory interest.  Id. at
75.  Mr. Coleman notes that the amounts used to calculate this
estimate of damages are an underrepresentation of the royalties
properly due to the Rollers.  Id. at 75-76.

        As Mr. Coleman's qualifications have already been
established, we now turn to the reliability of Mr. Coleman's
methodology and whether the opinion is helpful to the trier of
fact.  Arista argues that Mr. Coleman's opinion is not reliable
because it includes the sum from the 1975 and 1976 audit
reports-documents about which he has no opinion on accuracy-
that he did not consider the impact of the 1981 Agreement which
released Arista from most audit claims and foreclosed his
attempts to adjust deductions for CD packaging and digital
royalty rates, and finally that his opinions on digital sales
and the royalty deduction were unsubstantiated.  Mr. Coleman
analyzed the documents produced by Arista and put together a

"minimum" estimate of damages owed.  The estimate included
several figures that Arista had conceded, and the rest come
directly from Arista's document production.  Arista's critique
that the royalty deduction was unsubstantiated is contradicted
by Mr. Coleman's explanation that the parties' agreement did not
allow for such a deduction and the fact that Arista's own
expert, Tom Nilsen, applied the deduction as well.  Coleman
Rept. at 21; Nilsen Tr. at 141:21-25.

        Arista's objection to the use of the audit reports is
equally unpersuasive.  Mr. Coleman is not precluded from
providing an opinion that incorporates the audit numbers, even
where he has not reviewed all of the documents surrounding the
audit.  Mr. Coleman analyzed the documents produced, found no
evidence that the audits had been paid off, and, based on his
experience, determined how those audits would have been
resolved.  The admissibility standards of the Federal Rules of
Evidence warrant exclusion only in the case of serious flaws in
reasoning or methodology.  Amorgianos, 303 F.3d at 267.  Where
the experts can reasonably disagree on the testimony, the jury,
not the judge should decide among the opinions.  Kumho Tire, 526
U.S. at 153.  Here, there is no serious flaw in Mr. Coleman's
reasoning.  Arista may disagree with his conclusions, i.e., the
calculation of estimated damages, but the introduction of its

own rebuttal expert is the appropriate course of action in cases where experts can disagree on the conclusions.  Additionally, in a case where the amount of royalties is at issue, an expert's view on the amount owed is certainly helpful to the trier of fact.  The matter should be for the jury to determine after considering all the testimony.  Accordingly, Arista's motion to exclude Mr. Coleman's opinion on the minimum damages owed estimate is denied.

Next, Arista seeks to exclude Mr. Coleman's release-based damages estimate.  The release-based estimate calculates royalties based on known releases of Plaintiffs' music.  Coleman Rept. at 79-85.  Arista seeks to exclude this opinion because the methodology is not reliable, it ignores actual sales data, and the estimate was not reliably applied to the facts.  Def. Br. at 17-18; Def. Reply at 6.  First, Arista argues that the "fundamental defect" in Mr. Coleman's use of the release-based estimate is that it rejects Arista's records in favor of "unsupported speculative assumptions."  Def. Br. at 17; Def. Reply at 6.  Courts in this Circuit have excluded an expert who calculated royalties based on the number of releases because "projections" are inappropriate where the expert "had royalty statements reflecting actual, not projected, sales."  Robinson v. Sanctuary Record Groups, Ltd., 542 F.Supp. 2d 284, 293

(S.D.N.Y. 2008).   In <u>Robinson</u>, the expert did not review all the relevant documents produced.   In fact, the expert relied upon lists created by Plaintiffs containing recordings relevant to the calculation of damages.   <u>Id.</u> at 291.   The expert also did not verify the advances and sales projections from the third-party license agreements with the third-parties, from whom they were able to seek discovery and admitted that his calculations contained "material errors such as double-counting."   <u>Id.</u> at 293.   The court found the expert's testimony was not reliable noting that, "Plaintiffs' explanation that they did not have sufficient documentation to make accurate accounting does not by some unknown alchemy convert unreliable evidence into reliable evidence."   <u>Id.</u>

Here, Mr. Coleman has disregarded the voluminous production of historical sales and royalty records produced by Arista.   As discussed above, Mr. Coleman opined that no foreign royalty data exists but had not reviewed tens of thousands of lines of detailed data reflecting decades of foreign royalty-bearing sales (Nilsen Rept. at 14-18), did not review other key documents (<u>compare</u> Leak Decl. Exs. C, E, G, H, K, M <u>with</u> Coleman Rept. Ex. F; <u>see also</u> Coleman Tr. at 136:18-144:21), and rejected documents without sufficient analysis, including a

150,000-line spreadsheet with data reported by foreign

territories (Coleman Rept. at 72-73; Leak Decl. Ex. J).

      Plaintiffs' explanation for ignoring Arista's

historical records, explained in Mr. Coleman's supplemental

declaration, is that the documents identified by Arista that Mr.

Coleman did not initially review are "not of a type an auditor

would rely on to verify the accuracy and completeness of

documents." Coleman Decl. ¶ 43. As discussed earlier, this

summary rejection was not reliable because the methodology

behind expert analysis should be made to produce results, not to

justify the results already reached. See E.E.O.C. v. Bloomberg

L.P., Civ. No. 07-8383 (LAP), 2010 WL 3466370, at *17 (S.D.N.Y.

Aug, 31, 2010) ("To ignore contradictory testimony in order to

arrive at a desired conclusion highlights the unreliability of

[expert's methodology.")

      The appearance that Mr. Coleman's methodology is

result-oriented is underscored by Plaintiffs' acknowledgement

that "no amount [sic] of answers [from Arista] could have

satisfied [Mr. Coleman]." Pl. Opp. at 8 n.7. Additionally, Mr.

Coleman had every opportunity to locate such "source documents"

in order to verify Arista's historical records for use in

calculating royalties or to compare the foreign royalty data

with the data reported by foreign territories. Throughout the

extensive discovery and expert discovery in this case, Mr. Coleman did not seek out further documents to verify the Arista records.

In response, Mr. Coleman states that he has testified regarding the release-based and interpolation method damages estimate several times and this testimony has never been excluded.  Coleman Decl. ¶¶ 6-7, 14-16.  In his report, Mr. Coleman does not provide any details on the instances where he testified about release-based damages.  In his supplemental declaration, Mr. Coleman identifies two cases where plaintiffs were awarded the amount he calculated based upon a release-based calculation of unreported royalties.  He does not provide details as to the royalty records in those cases or draw useful comparisons to the facts of the instant case.  The fact that Mr. Coleman has been permitted to testify in the past about this royalties estimate alone does not shed any light on whether or not such an estimate should be permitted here, under these circumstances.

Various other problems plague Mr. Coleman's release-based estimate.  For example, Mr. Coleman uses a single royalty rate he created based on assumptions that Plaintiffs' recorded eight albums under the agreement and that sales by Arista's licensees abroad were not significant.  Coleman Decl. ¶¶ 33-34;

Coleman Tr. at 169:20-170:21.  The 1975 Agreement set royalty rates for albums recorded under it (Topper Decl., Ex. 8 ¶ 6(q)), and Mr. Coleman does not explain why those rates were not used to calculate estimated royalties.  Indeed, Mr. Coleman seemingly admits that the average price he used overstates the price of albums when most sales occurred.  Coleman Decl. ¶ 28.  The myriad inconsistencies, result-driven methodology, and refusal to use historical data or request documents needed to verify the historical data indicates that Mr. Coleman's release-based damages estimate is unreliable as expert testimony and will not be permitted.

Finally, the interpolation damages estimate uses a mathematical model to calculate amounts owed between and among reliable datapoints.  Mr. Coleman's model used public data from the 1970s and corrected Sony records after 2003 as the endpoints.  Coleman Rept. at 93-95.  The model contained an exponential decay curve fit model which was based on the expectation that the Plaintiffs would experience an initial, sharp decline in sales followed by a longer, gradual decline in sales.  Coleman Decl. ¶ 22.

Because Mr. Coleman was not the sole designer of the interpolation model he used, this Court must assess whether Mr. Coleman is qualified to testify about interpolation.  As

44

discussed earlier, Ms. Crain's supplemental declaration has been stricken because she was an un-offered expert, and therefore her testimony may not assist the jury in their understanding of the interpolation method of damages.  An expert seeking to present opinion testimony to a jury must be "qualified as an expert by knowledge, skill, experience, training, or education."  Daubert, 509 U.S. at 588 (quoting Fed.R.Evid. 702).  Mr. Coleman lacks appropriate qualifications to present the interpolation method to the jury.  Mr. Coleman has no expertise in mathematics.  (Coleman Tr. at 42:24-43:4).  He could not explain the formula his staff used and whether that formula included a variable other than time.  (Id. at 49:10-50:23).  He lacks familiarity with other types of statistical curves used to model data and could not address why one curve was preferable to another.  (Id. at 43:5-21).

The reason for Mr. Coleman's lack of direct, first-hand knowledge on the subject is as follows:  "I have relied upon, again, my analyst and my partner who are experts in math and computer science.  I rely from their expertise to determine which one of those methodologies that we use."  (Id. at 42:17-21).  Mr. Coleman admittedly relied on another's expertise to produce his opinion on this subject.  Accordingly, his testimony is excludable as "conduit testimony from an expert on a matter

outside his field of expertise." Malletier v. Dooney & Burke, Inc., 525 F. Supp. 2d 666 (S.D.N.Y. 2007) (financial consultant not allowed to testify regarding statistical analysis of sales data); see also Dura Auto. Sys. Of Indiana v. CTS Corp., 285 F.3d 609, 612-14 (7th Cir. 2002) (excluding relied-upon expert because he "exercise[d] professional judgment that is beyond [his] ken" and "the soundness of the underlying expert judgment is in issue.").

Plaintiffs argue that the same cases cited by Defendant specifically permit an expert like Mr. Coleman to rely in part on the expertise of his partner, Ms. Crain. Pl. Opp. at 15-17. Indeed, an expert may rely on assistants or the opinions of other experts in formulating their own expert opinions. See Dura, 285 F.3d at 612 ("[a]n expert witness is permitted to use assistants in formulating his expert opinion, and normally they need not themselves testify") (internal citations omitted); Malletier, 525 F. Supp. 2d at 664 (S.D.N.Y. 2007) ("[i]t is true that experts are permitted to rely on opinions of other experts to the extent that they are of the type that would be reasonably relied upon by other experts in the field."). While these propositions are generally true, a more complete reading of the cases mandates the conclusion that Mr. Coleman is not qualified to testify on the subject of the interpolation method.

In Dura, Judge Posner explained that assistants may be relied upon by supervising experts because assistants may be deposed prior to trial to determine if they performed their tasks sufficiently and the expert can be deposed regarding his or her supervision of the tasks.  Judge Posner continued: "[a]nalysis becomes more complicated if the assistants aren't merely gofers or data gatherers but exercise professional judgment that is beyond the expert's ken."  Dura, 285 F.3d at 613.  In Dura, the proposed expert's assistants "did not merely collect data for [the expert] to massage or apply concededly appropriate techniques in a concededly appropriate manner, or otherwise perform routine procedures, and that [the expert] himself lack[ed] the necessary expertise to determine whether the techniques were appropriately chosen and applied."  Id. at 615.  The court found that the use of the specific models in the circumstances "required a host of discretionary expert judgments for the affiants, not [the expert] to make."  Id.

In Malletier, the court found that the expert was not qualified to testify on regression analysis because he was relying on an analysis conducted by another individual and the expert "admitted that he essentially had nothing to do with the preparation of the regression analysis."  525 F. Supp. 2d at 664.  The court went on to note that the expert could not give

his opinion relying completely on the regression analysis because "the expert witness must in the end be giving his _own_ opinion.  He cannot simply be a conduit for the opinion of an unproduced expert." Id. (emphasis in original).[4]

Similarly here, Ms. Crain exercised far more discretionary judgment than an assistant gathering data.  Ms. Crain was the designer of the model, chose the endpoints, and constructed the model based on her own expertise.  Crain Decl. at 5-15.  Mr. Coleman did not supervise her work because, as discussed supra, he did not have knowledge of the field.  Accordingly, Mr. Coleman is not qualified to testify as an expert on the interpolation method of calculating royalties.

3. Mr. Nilsen's Testimony

Mr. Nilsen prepared an expert report in response to the opinions offered in Mr. Coleman's report.  The purpose of Mr. Nilsen's being retained was for him to review and respond to Mr. Coleman's expert report.  Mr. Nilsen has experience of more than

---

[4] Plaintiffs also cite In re Bayou Grp., 439 B.R. 284, 331-32 (S.D.N.Y. 2010) where the court allowed expert testimony where the expert was not experienced in hedge fund analysis but had partners and associates with such expertise. Plaintiffs' citation is misleading because the court notes that the report and its conclusions did not rely on hedge fund-specific accounting analysis. The only portion of the report that involved a hedge-fund specific issue was a legal issue on which the court had ruled and where the inclusion at issue was industry standard.  Here, the development of the interpolation model is not standard in the industry.  Ms. Crain created and developed what she believed to be the appropriate interpolation model for these specific circumstances.

30 years in the music industry managing royalty departments and working for a music industry accountancy firm.  With this experience in mind, the Court finds that Mr. Nilsen is qualified to testify as an expert on the issues raised in Mr. Coleman's report.

Mr. Nilsen's report and testimony is in response to the opinions offered in Mr. Coleman's report and testimony. Therefore, his opinions on Arista's records, the release-based royalty estimate, and the interpolation method will not be required because the Court has granted Defendant's motion excluding Mr. Coleman's testimony on those subjects.  The Court need not decide Plaintiffs' motion to exclude the testimony of Mr. Nilsen on the subjects of Arista's records, the release-based estimate, or the interpolation estimate.

Finally, the standard for a rebuttal expert witness is the same as for any expert witness, though the expert's testimony should be to "explain, repel, counteract or disprove evidence" presented by the expert to whom he or she is responding.  See Marmo v. Tyson Fresh Meats, Inc., 457 F.3d 748, 759 (8th Cir. 2006).  Plaintiffs argue that Mr. Nilsen may not rely on Arista's records to determine the minimum royalties due and that his calculation is not based on any industry-accepted analysis.  Pl. Br. at 17.  Mr. Nilsen's rebuttal to Mr.

49

Coleman's minimum royalty amount owed was offered after a review of each of the categories of monies Mr. Coleman claimed and a determination as to whether the amount claimed was actually owed. Def. Opp. at 17. This methodology was reliable, and the analysis of Mr. Coleman's opinion would be helpful to the jury. Indeed, Plaintiffs do not seem to object to Mr. Nilsen's accounting of Mr. Coleman's estimate but rather solely object to the alternative calculation of $1,042,203.14. Pl. Reply. at 7.

As discussed earlier, where the experts reasonably disagree on the conclusions presented, the jury, not the judge should decide among the opinions. Kumho Tire, 526 U.S. at 153. Here, there is no serious flaw in Mr. Nilsen's analysis of Mr. Coleman's minimum damages owed estimate. Mr. Nilsen's calculation is based on his item by item review of Mr. Coleman's opinion and the bases for that opinion. Def. Opp. at 9. Any disagreement about Mr. Nilsen's opinion or the figure itself certainly can and should be addressed on cross examination in front of the jury. Mr. Nilsen's opinion on Mr. Coleman's claim for the minimum royalties owed is therefore permitted, and Plaintiffs' motion to exclude such testimony is denied.

III. CONCLUSION

For the foregoing reasons: (1) Defendant's Motion to Exclude the Expert Report of Wayne C. Coleman [dkt. no. 189] is

GRANTED with regard to Mr. Coleman's opinions on the status of
Arista's records, the release-based damages estimate, and the
interpolation damages estimate and DENIED with regard to the
minimum royalties owed damages estimate; (2) Plaintiffs' Motion
to Exclude the Expert Report of Tom Nilsen [dkt. no. 187] is
DENIED with regard to the minimum royalties owed damages
estimate; and (3) the Court need not decide Plaintiffs' Motion
to Exclude the Expert Report of Tom Nilsen [dkt. no. 187] on the
subjects of Arista's records, the release-based estimate, or the
interpolation estimate because it is moot in light of (1).

SO ORDERED.

Dated:    New York, New York
          September 15, 2014


                                   _____
                                   UNITED STATES DISTRICT JUDGE